George WICKHAM II, et al., Appellants,

v.

SAN JACINTO RIVER AUTHORITY,
Appellee.

William and Judith BAKER,
et al., Appellants,

v.

SAN JACINTO RIVER AUTHORITY,
Appellee.

Nos. 09–97–139 CV, 09–97–141 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Oct. 15, 1998.

Decided Dec. 10, 1998.

Clifton F. Douglass, James L. Branton, Branton & Hall, Thomas Andrew Crosley, San Antonio, for appellant.

Jonathan S. Day, Mayor, Day, Caldwell & Keeton, Houston, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

This appeal is companion with the appeals of Dexter M. Patterson and Vicki L. Patterson, No. 09–97–134 CV; Charles W. Robinson, Jr. and Kelly R. Robinson, No. 09–97–135 CV; James La Rose, et al, No. 09–97–144 CV; Donald M. Orand and Margaret E. Orand, No. 09–97–148 CV; and Aetna Casualty and Surety Company, No. 09–97–190 CV, v. San Jacinto River Authority. Although those cases are addressed in a separate memorandum opinion, due to commonality of facts, evidence, causes of action and appellate issues, the holdings herein shall be equally applicable to, and dispositive of, the issues raised in those companion cases.

The trial court granted appellee's motions for summary judgment on all of appellants' various causes of action. A single incident is at the heart of the instant appeal as well as of those involved in the above-named companion appeals, namely the apparently unprecedented rain event that occurred between October 16, through October 19, 1994 in the Montgomery County, Texas area, and the concurrent widespread flooding of the appellants' property. Appellee, a political subdivision of the State of Texas, operated Lake Conroe and the Lake Conroe Dam located on the west fork of the San Jacinto River. Appellee continues to operate said facility at this point in time. It is undisputed, that Lake Conroe functions as a water storage reservoir for the City of Houston, other residential areas, and a variety of surrounding business enterprises. Neither Lake Conroe nor its Dam was designed to function as a flood control facility, but simply exists to maintain a level of water so as to supply its customers with a previously contracted amount of water. Any further factual discussion will be reserved for our resolution of the issues presented when necessary.

## ADMISSIBILITY OF SUMMARY JUDGMENT EVIDENCE

Appellants objected to affidavits and Exhibits A through I which accompanied appellee's motion for summary judgment. The affidavits were from James R. Adams, a professional engineer and General Manager of the Authority, Blake Kellum, Water Quality Supervisor for the Authority, Remmie Scarborough, manager of the Lake Conroe Division and custodian of the records of the Authority, and Russell G. Heinen, a registered professional engineer, who prepared a chart depicting rates of flow into and release of water from Lake Conroe during October 16 through October 20, 1994. Based upon their respective affidavits, these men certainly had specialized knowledge so as to assist the trial court in understanding the evidence, and each was qualified by knowledge, skill, experience, training, and education to testify as an expert in compliance with TEX.R. CIV. EVID. 702.

After examining appellee's exhibits in question, we find no error in the trial court's denial of appellants' motion to strike said evidence. Exhibits A, B, C, H, and I were business records of the Authority and, as such, complied with hearsay exception TEX.R. CIV. EVID. 803(6). While not self-authenticating, Exhibits A, B, C, H, and I were authenticated by the affidavits of Adams, Kellum, and Scarborough so as to satisfy TEX.R. CIV. EVID. 901(a). Exhibit G, a flood report from the Harris County Flood Control District, was accompanied by an affidavit complying with Rule 803(6) and 902(10). *See also State v. Foltin*, 930 S.W.2d 270, 272–73 (Tex. App.—Houston [14th Dist.] 1996, writ denied). Exhibits D, E, and F were records kept and generated by the National Weather Service, the United States Department of Commerce, Weather Bureau, and the United States Geological Survey of the Department of the Interior, respectively. Each was referenced in Mr. Adams' affidavit as being true and correct. Exhibits D, E, and F were also self-authenticating as an official publication under TEX.R. CIV. EVID. 902(5). We conclude that the affidavits and exhibits in question were admissible as proper summary judgment evidence.

## STANDARD OF REVIEW

■ The object of Rule 166a of the Texas Rules of Civil Procedure is to eliminate those claims which are patently unmeritorious. *See Casso v. Brand*, 776 S.W.2d 551, 556 (Tex.1989). Summary judgment is "not ... intended to deprive litigants of their right to a full hearing on the merits of any real issue of fact." *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (Tex.1952) (quoting *Kaufman v. Blackman*, 239 S.W.2d 422, 428 (Tex.Civ.App.—Dallas 1951, writ ref'd n.r.e.). In reviewing the instant summary judgment, we must determine whether the appellee, as movant, met its burden to establish that no genuine issue of material fact exists. *Nixon v. Mr. Property Mgt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). A summary judgment for the defendant which disposes of the entire case is proper only if, as a matter of law, the plaintiff could not succeed on any theory pleaded. *Interstate Fire Ins. Co. v. First*

*Tape, Inc.*, 817 S.W.2d 142, 144 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

■ To obtain summary judgment, a movant may either negate at least one element of the plaintiff's theory of recovery or plead and conclusively establish each element of an affirmative defense. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). Summary judgment is also proper if a defendant shows the law does not recognize the cause of action for which the plaintiff seeks to recover. *A.C. Aukerman Co. v. State*, 902 S.W.2d 576, 577 (Tex.App.—Houston [1st Dist.] 1995, writ denied).

## TORT LIABILITY AND THE TEXAS TORT CLAIMS ACT

■ A governmental entity, such as appellee, is immune under common law from both suit and liability in the absence of an express waiver of immunity by the legislature. *See Duhart v. State*, 610 S.W.2d 740, 741–42 (Tex.1980). In their brief, appellants contend that appellee is liable for the various tort causes of action based upon TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1) (Vernon 1997), which provides:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; ...

Under § 101.001(3) of the Tort Claims Act, the term "motor-driven equipment" explicitly excludes the following: "(A) equipment used in connection with the operation of floodgates or water release equipment by river authorities created under the laws of this state[.]" As the sole event for which all appellants are seeking recovery has as its basis the release of water from Lake Conroe by means of the floodgates of appellee, § 101.021 does not

provide appellants with a cause of action under the particular facts of the case. This issue is overruled as summary judgment was proper on the tort causes of action.

## NUISANCE

Governmental entities may be liable for nuisances created or maintained in the course of non-negligent performance of governmental functions. *See City of Tyler v. Likes*, 962 S.W.2d 489, 503–04 (Tex.1997). As such, sovereign immunity is not a defense to a claim of non-negligent nuisance. *See Shade v. City of Dallas*, 819 S.W.2d 578, 581 (Tex.App.—Dallas 1991, no writ).

A nuisance is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it. *Loyd v. ECO Resources, Inc.*, 956 S.W.2d 110, 125 (Tex.App.—Houston [14th Dist.] 1997, no writ); *Maranatha Temple, Inc. v. Enterprise Products Co.*, 893 S.W.2d 92, 98–99 (Tex.App.—Houston [1st Dist.] 1994, writ denied). To maintain a cause of action for nuisance, a plaintiff must be able to show the alleged nuisance is inherent in the condition or thing itself, beyond that arising from alleged improper or negligent use. *See Loyd*, 956 S.W.2d at 125; *Schneider v. City of Cuero*, 749 S.W.2d 614, 617 (Tex.App.—Corpus Christi 1988, writ denied).

In the instant case, appellants do not allege there is anything inherent in Lake Conroe or the Lake Conroe Dam which renders either one a nuisance separate and apart from any alleged improper act or omission of employees of appellee. It would appear that in Texas a water supply reservoir, and its associated dam, is not a nuisance. *See Chicago, R.I. & G. Ry. Co. v. Tarrant County Water Control & Improvement Dist. No. 1*, 123 Tex. 432, 73 S.W.2d 55, 64 (1934) (stor-age reservoirs are an appropriate means of utilizing surplus water and one commonly in use). Furthermore, the basis of the underlying lawsuit is directed to one single event occurring on one occasion.[1] We find no Texas cases specifically holding that a single, temporary event can support a claim for nuisance. The cases cited by appellants recognize that the invasion of rights must be inherent in the condition itself beyond arising from negligent or improper use.[2] We overrule appellants' complaints of trial court error regarding the nuisance issue as summary judgment was proper on this cause of action.

## INVERSE CONDEMNATION

Article I, section 17 of the Texas Constitution provides in part that no person's property is to be taken for or applied to public use without adequate compensation being made, unless by the consent of such person. TEX. CONST. art. I, § 17. In order to recover under the theory that property has been taken under this section of the Constitution, plaintiff must establish that the governmental entity intentionally performed certain acts that resulted in a "taking" of one's property for public use. *City of Houston v. Crabb*, 905 S.W.2d 669, 673 (Tex. App.—Houston [14th Dist.] 1995, no writ). "Whether a 'taking' has occurred under inverse condemnation is a question of law." *Bennett v. Tarrant County Water Control and Improvement Dist.*, 894 S.W.2d 441, 448 (Tex.App.—Fort Worth 1995, writ denied).

Under Texas law, a "taking, damage, or destruction" for inverse condemnation purposes is defined as physical appropriation or invasion of property, or unreasonable interference with a landowner's right to use and enjoy the property. *See DuPuy v. City of Waco*, 396 S.W.2d 103, 108–09 (Tex.1965). In this case, the affidavit from appellee's expert, James R. Adams, the general manag-

---

1. Although two other flood events are alleged, the affidavit by George Wickham, II, indicates that he suffered no injury from these two prior "floods," just a bit of excess water in the drainage ditches. As such, summary judgment evidence is lacking as to any other flood events.

2. *Bible Baptist Church v. City of Cleburne*, 848 S.W.2d 826, 829–30 (Tex.App.—Waco 1993, writ denied); *Shade v. City of Dallas*, 819 S.W.2d 578, 581–82 (Tex.App.—Dallas 1991, no writ); *Abbott v. City of Kaufman*, 717 S.W.2d 927, 932 (Tex. App.—Tyler 1986, writ dism'd w.o.j.); *City of Uvalde v. Crow*, 713 S.W.2d 154, 156 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.); *City of Princeton v. Abbott*, 792 S.W.2d 161 (Tex.App.—Dallas 1990, writ denied).

er of the San Jacinto River Authority, included the following:

20. The October event significantly exceeded the 100–year frequency rainfall event as established by the U.S. Department of Commerce, Weather Bureau. In Montgomery County, the 100–year frequency rainfall event is equivalent to (1) approximately 12.5 inches of rain in any 24–hour period, or (2) approximately 8.5 inches of rain in any 6–hour period. *See* Exhibit E to Defendant's Motion for Summary Judgment at 42 and 56. The October event greatly exceeded these levels. During only the 19–hour period between 1:00 p.m. on October 16 and 8:00 a.m. on October 17, over 14.2 inches of rain fell at Conroe. During the 6–hour period between approximately 11:00 p.m. on October 16 and 5:00 a.m. on October 17, approximately 11.9 inches of rain, 40% more than the 100–year rainfall frequency amount, fell at Conroe. *See* Exhibit D to Defendant's Motion for Summary Judgment at p. H–1 to H–3.

. . . .

22. At Humble, just past the confluence of the West Fork with Cypress Creek and Spring Creek, the combined streams reached a record height of at least 66.79 feet msl [mean sea level]. [*See* Exhibit G to Defendant's Motion for Summary Judgment, at p. 3]. According to the Harris County Flood Control District, this was approximately 5 feet higher than the pre-Lake Houston record level (May 1929) and 12 feet higher than the post-Lake Houston record level (May 1989). *Id.*

. . . .

24. Although the October event ultimately set new rainfall records, the initial rainfall during the afternoon and early evening of October 16, 1994 was mild. The level of the Lake did not reach 200.20 msl until 4:28 p.m. Not until approximately 10:00 p.m. did it become apparent that the level of the Lake would top 201 feet msl. At that time, Authority personnel went out to the gate structures to begin procedures to open the gates. The level of the Lake reached 201.00 msl at approximately 10:25 p.m. In accordance with the policy guidelines regarding operation of the Dam, Authority personnel initially activated the electric motors that operate the gates to raise gates 2 and 4 each two-tenths of one foot and to permit a discharge of approximately 426 cfs [cubic feet per second]. This initial opening was recorded at 10:45 p.m. At this point, approximately 13,143 cfs of water was entering the Lake, and the Authority was passing through approximately 426 cfs.

25. Following the initial opening of the gates, the level of the Lake rose rapidly. Just prior to approximately 11:45 p.m. on October 16, 1994, the pool level of the Lake reached 201.45 msl. In response to the continuing rise in Lake level, Authority personnel then opened the gates to permit a discharge of approximately 1,585 cfs (opening all gates to three-tenths of one foot). This opening was recorded at 11:45 p.m. At this point, approximately 105,228 cfs of water was entering the Lake, and the Authority was passing through approximately 1,585 cfs.

26. Consistent with its operating policy, protection of the Dam and downstream structures and the circumstances, the authority gradually opened the gates throughout the flood event, up to a maximum six-foot opening in each gate at 2:00 p.m. on October 17. *See* Exhibit H to Defendant's Motion for Summary Judgment, which is a true and correct copy of the Authority's record of water passed through the gates during the October event. At this point, approximately 42,575 cfs of water was entering the Lake, and the Authority was passing through approximately 33,343 cfs.

27. Despite the six-foot opening of each gate, the Lake continued to rise. The pool level reached a maximum height of 205.58 feet msl at 7:14 p.m. on October 17, 1994. This level is the highest pool level the Authority has ever recorded at the Lake.

As we appreciate the operative facts from Mr. Adams' affidavit, rainfall alone in the area in which appellants' resided far exceeded any recorded 100–year flood totals. Significantly more to the point, Adams' affidavit indicated that rainfall amounts recorded as

being captured in Lake Conroe from about 10:25 p.m. to 11:45 p.m. on October 16, far surpassed the amount of water being released into the San Jacinto River at the same time. Obviously, if records indicate that Lake Conroe is taking in 105,228 cubic feet per second of water via rainfall at about 11:45 p.m. on October 16, the San Jacinto River (on the other side of the dam) must also have been taking in the same enormous amount of water. At the same time, appellee was releasing 1,585 cfs into the River. From our examination of the summary judgment evidence, neither party indicated at what point in time, if at all, the San Jacinto River itself overflowed its banks.

Appellants' evidence in response to the motion for summary judgment included affidavits from named-plaintiffs George Wickham, II, and William Baker. Also included was an affidavit from Traci Williams, the manager of Kingswood Lakes Apartments at the time of the flood. Mr. Wickham indicated that the Lake Conroe area experienced significant rainfall in early to mid-October 1994. During the afternoon of October 17, 1994, Wickham stated that his home and business became "inundated with rising water from the San Jacinto River." He also stated that he had no warning from any authorities that his property would be flooded. Mr. Baker provided a much more detailed sequence of events. We quote from his affidavit:

On Monday morning, October 17, 1994, at 7:20 a.m. [sic] I drove to work on Highway 1960 over the San Jacinto River Bridge. At that time and at that location, the river was within its banks. When I drove home that evening over the San Jacinto River Bridge, there were still no signs of flooding.

On Tuesday, October 18, 1994, my wife and I arose at 5:30 a.m. to begin getting ready for work. At 6:30 a.m., our insurance agent came by the house and said he was evacuating another lady who lived near our neighborhood because of high water.

At 6:30 a.m., on October 18, 1994, there was no water in my yard or in the ditches around my house. I scanned the television stations and the radio for information about any flooding. The reports I heard stated that there would only be light flooding and that the waters would not be any higher than the waters of the 1992 flood.

At 7:00 a.m., on October 18, 1994, the ditch across the street started filling with water. My neighbor from across the street came over to my house and said he was worried about the rising water getting into his garage. I helped my neighbor put a freezer in his garage up on blocks.

At 7:30 a.m. on October 18, 1994, I began calling around town to try to rent a truck to move my belongings from the house. At 7:45 a.m. I located a truck at East Texas Rentals.

At 8:00 a.m. on October 18, 1994, water was flooding my property up to my garage.

At 8:15 a.m. on October 18, 1994, water was flooding my property up to the front door.

My house at 1021 Forest cove [sic], Kingwood, Texas, has ceilings that are eight feet high. By 11:00 a.m. on October 18, 1994, the floodwaters were one and a half feet *above* my ceilings and the entire house was flooded.

The floodwaters in my home did not begin to subside until Wednesday night, October 19, 1994. The flood waters [sic] were completely gone by Thursday, October 20, 1994, and I was able to return to my home to start cleaning it up on Friday, October 21, 1994. [emphasis in original]

Ms. Williams' affidavit indicated that a hard rain occurred on October 16 and October 17, 1994. Around noon on October 18, 1994, water "started rising." She then stated that "by early evening" on October 18, "the parking lot was underwater." Ms. Williams was summoned to the apartment complex at about 3:00 a.m. on October 19 by the assistant manager. At that time, she indicated that the water had "risen to a level in which it covered the swimming pool, the lake and had also entered all of the apartments located on the first floor." She further stated that some apartments had as little as four inches of water in them while others had taken on as much as one foot. Ms. Williams also noted that at a nearby

apartment complex, Kings Crossing Apartments, most of the units did not suffer interior water damage; however, the exterior of the buildings did.

As noted above, the records from appellee indicate that during the maximum release of water from Lake Conroe into the River, on the afternoon of October 17, more water was still entering the River via rainfall than was being released into it. Representative of appellee's evidence refuting the "taking" element is found in the deposition testimony of James Adams as he is being questioned by counsel for appellants:

Q. Okay. And would you agree that the River Plantation area received a great deal of the water that was released through the flood gates on October 16th and 17th, 1994?

A. They received an awful lot of water from Lake Creek, too, and from White Oak Creek and Stewart Creek. They received an awful lot of water, other than what was released from Lake Conroe.

. . . .

Q. Did the people who owned property in River Plantation, and other property owners downstream, ever give you oral or written authority to put water on to their property?

A. We didn't put water on their property; we put water on the river.

Q. And that water went on to their property, didn't it?

A. Some water went on their property; I don't know whether it was that water or not.

In addition to the fact that appellee never released more water than was entering the San Jacinto River, Adams' deposition testimony makes it clear that the water being released from Lake Conroe was flowing directly into the San Jacinto River, not directly onto appellants' property. From the point of release, the water flowed into the River and went downstream and mixed into other tributaries which apparently overflowed their banks resulting in flooding. Standing alone, this would be sufficient summary judgment evidence to negate the "taking" element in appellants' inverse condemnation claim.

As previously noted, once a defendant produces sufficient evidence to establish the right to summary judgment, the plaintiff must present evidence sufficient to raise a fact issue. *See Centeq Realty, Inc.*, 899 S.W.2d at 197. In the instant case, any belief contained in the affidavits of Wickham, Baker, or Williams specifically attributing the flooding on October 17, 18 or 19 to the San Jacinto River is conclusory and therefore not competent summary judgment evidence. *See Morin v. Helfrick*, 930 S.W.2d 733, 738 (Tex.App.—Houston [1st Dist.] 1996, no writ). The affidavit from appellants' expert, Dr. Wesley P. James, is, quite frankly, focused on appellants' tort allegations as his statements go to placing blame on appellee for failing to foresee the severe nature of the oncoming storm, failing to pre-release water from Lake Conroe so as to eliminate the need to release any water into the San Jacinto River, making a rush to judgment as to the real danger of dam failure, and by appellee's failure to follow its own guidelines (CONGO) in releasing too small an amount of water for the amount of water already in the Lake between roughly 2 a.m. and 5 a.m. on October 17. Typical of Dr. James' conclusions, taken from examining public records filed with appellee's motion for summary judgment along with James Adams' affidavit, are those set out as follows:

13. The Authority could take other preventative measures to *reduce* downstream flooding. For example, the Authority currently strives to maintain the Lake at 201 feet msl. However, the Authority could store water at lower level, such as 197 feet msl without damaging the Dam's integrity. If the Authority stored water at a level of 197 feet msl rather than 201 feet msl, it could provide an additional 78,410 acre feet of water between 197 feet msl and 201 feet msl for flood control purposes. [emphasis added]

14. Adams' affidavit submitted in support of the Authority's Motion and review [sic] by me is also overly concerned about the possibility of Dam failure during the October, 1994 Flood. The earthen Dam is approximately 11,000 feet across with a top elevation of 212 feet msl. The Authority

also holds an easement around the Lake up to 207 feet msl. Between 201 feet msl and 207 feet msl the Authority could temporarily hold an additional 139,230 acre feet of water. If the Authority had held water to the full extent of its 207 feet msl right-of-way, the peak flow of the San Jacinto River at I–45 could have been reduced from 115,000 cfs to approximately 95,000 cfs.

As can be readily seen, Dr. James' opinion in paragraph 13 speaks in terms of what the appellee "could" do to "reduce" downstream flooding. On its face, this statement strongly implies that downstream flooding was inevitable because Dr. James, for whatever reason, does not speak in terms of what could have been done to eliminate the downstream flooding. Likewise, in paragraph 14, Dr. James indicates how appellee could have "reduced" the "peak flow" of the San Jacinto River from 115,000 cfs to 95,000 cfs. We can only speculate as to whether this would have *eliminated* the flooding in appellants' homes entirely, or, again, merely "reduced" the flooding. We conclude that appellants' evidence in response to the motion for summary judgment does not raise a fact issue with regard to the "taking" element of the inverse condemnation claim. As such, summary judgment was proper on this issue.

As we have found summary judgment proper on all issues raised in appellants' brief, we affirm the summary judgment of the trial court.

AFFIRMED.

BURGESS, Justice, concurring and dissenting.

I agree with the majority in that portion of the opinion entitled "Tort Liability and the Texas Tort Claims Act." I disagree with the remaining portion. I believe this case is sufficiently similar to *Golden Harvest Co., Inc. v. City of Dallas,* 942 S.W.2d 682 (Tex. App.—Tyler 1997, writ denied), in that the analysis of Justice Holcomb is applicable to this case, and is correct and therefore should be followed. *Golden Harvest Co., Inc.* 942 S.W.2d at 688–90. Consequently, I concur in part and dissent in part.