In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00040-CV
_____

**JIM WALLER, ET AL., Appellants**

**V.**

**SABINE RIVER AUTHORITY OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B160341-C**

**MEMORANDUM OPINION**

Following a historic flooding event in March of 2016, Jim Waller, along with approximately one hundred other landowners downstream from the Toledo Bend Reservoir and Dam ("Appellants"), sued the Sabine River Authority of Texas (SRA-T) for inverse condemnation, private nuisance, and trespass to real property. SRA-T filed a plea to the jurisdiction asserting governmental immunity. SRA-T argued that governmental immunity had not been waived as Appellants could not establish

1

causation, could not establish the requisite *mens rea* for a takings claim, and Appellants' claims were preempted by federal law. Following two separate hearings, the trial court granted SRA-T's plea and dismissed all claims. In three issues on appeal, Waller argues the judgment must be reversed and the cause remanded for trial because: (1) the Supreme Court of the United States has held in *Arkansas Game and Fish Commission v. United States*[1] that a temporary flooding event can rise to the level of a governmental taking; (2) the trial court improperly applied a field preemption analysis when conflict preemption analysis was the correct standard; and (3) the evidence established causation, thus waiving government immunity. After careful consideration, we affirm the trial court's judgment.

## I. Background

The SRA-T and Sabine River Authority of Louisiana (SRA-L) jointly operate the Toledo Bend Project (Project), a hydroelectric power plant governed by the Federal Power Act (FPA). The 81-megawatt Project is located on the Sabine River at the Texas-Louisiana border. The Project includes a dam, reservoir, spillway, powerhouse, tailrace channel, station transformer, and a transmission line. The Project is operated pursuant to a Federal Energy Regulatory Commission (FERC) license. The original fifty-year license for the Project was issued in 1963. In

---

[1] 568 U.S. 23 (2012).

September 2011, before SRA-T's original license expired, SRA-T and SRA-L sought to renew their license to operate the Project. The federal government issued the new license, which covered a period of fifty years, in August 2014.

In connection with the licensing renewal process, FERC released a Draft and Final Environmental Impact Statement for Hydropower License (EIS). FERC released its draft EIS in June 2013. Afterwards, in July 2013, FERC held public meetings in Orange, Texas, and in Many, Louisiana, to address questions about its regulations that control SRA-T's and SRA-L's operation of the Project, which included questions about flood control. In the EIS, FERC explained:

> Flooding has occurred downstream of the Toledo Bend Project along the Sabine River, and several downstream residents recommend changes to current reservoir operations such as pre-releasing flows prior to storm events or drawing down the project reservoir.

> The size of the reservoir and current project operations provide some incidental flood control, but substantially lower reservoir levels associated with dedicated flood control operations, as recommended by downstream residents, would have adverse effects on water supply, power production, and recreational use and could conceivably exacerbate downstream flooding if rainfall from a predicted storm falls predominantly downstream of the dam.

In December 2013, FERC released its final version of the EIS. In it, FERC noted that "the [P]roject was built for the primary purposes of water supply and secondary purposes of hydroelectric power generation and recreation."

3

During the process to renew the Project's license, residents who live downstream of the Toledo Bend Dam presented their suggestions about changing the regulations governing the operation of the Project. They suggested changing the regulations so that SRA-T could lower Toledo Bend Reservoir from its usual minimum level of 168-172 feet mean sea level (msl) to 165–167 msl, and that SRA-T be authorized to release water in anticipation of events that might cause land downstream of the reservoir to flood. But in its final EIS, FERC stated "that there has (sic) been some flood storage benefits associated with operation of the project," and "found that the ability to efficiently practice pre-releases from the reservoir to lower the reservoir level before a flood[] is limited by key factors[,]" including the accuracy of rainfall predictions, the limited amount of water that could be pre-released without causing flooding, the time required to lower the reservoir, the long lag/travel time of flows, the effects of tributary inflow below the dam, and the common occurrence of high inflows and high reservoir levels before most events that had resulted in floods. The EIS also notes that SRA-T and SRA-L had taken measures to improve their ability to notify the public about the potential that areas downstream from the Project could flood.

During the 2003, FERC declined another request made by the residents who live downstream of the Toledo Bend Reservoir to amend the regulations governing

SRA-T's operation of the Project to allow the Project's mission to include lowering the reservoir level and pre-releasing water for the purpose of mitigating the damages that result during floods. In a letter dated November 24, 2003, FERC stated:

> The Toledo Bend Dam was not designed as a flood control dam. Review of historical flood-flow data indicates that the construction and operation of the Toledo Bend Dam has not increased the incidence of downstream flooding. In some flood events, the dam has been beneficial by delaying the flood flows by temporarily storing a portion of the flood inflow in the reservoir. The ability of the project to pre-release flow to obtain significant reservoir storage in anticipation of high inflows is severely limited by the downstream development, particularly [in] Deweyville, Texas. Therefore, to obtain flood control benefits, operation of the project would need to be changed to permanently lower the project reservoir level to provide flood control storage. Significantly lowering the reservoir to the extent necessary to provide appreciable flood control benefits would adversely impact the established reservoir recreation activities and power development.

While citizens made a similar request during the process involved in the renewal of SRA-T's license, FERC declined to amend the regulations to change the Project's goals to include using the dam on the Project to mitigate the effects inflicted on downstream residents by floods.

On March 9 and March 10, 2016, a historic rainfall event occurred in East Texas, which included areas upstream and downstream of the Toledo Bend Dam. Some of the communities near the Project received twenty to twenty-five inches of rain in a thirty-one-hour period. For example, the southern portion of the Project and the area immediately downstream received record or near-record rain. The large

5

amount of rain experienced in East Texas in March 2016 resulted in floods on the lower Sabine River and its downstream tributaries.

The Project notified the public that water would be released from the Toledo Bend Dam at 7:00 a.m. on Wednesday, March 9, 2016, when the reservoir rose to 172.27 feet msl. During the height of the March 2016 storm, the peak inflows measured for the Toledo Bend Reservoir exceeded 600,000 cubic feet per second (cfs), and the peak discharge was 207,644 cfs. The tributaries of the Sabine River, downstream from the Toledo Bend Dam, were recorded as having been at near-record or record levels during the storm.

Appellants allege their properties flooded after SRA-T released water from the Toledo Bend Dam, but they acknowledge SRA-T released the water in a manner that was consistent with its license. They sued SRA-T for nuisance, inverse condemnation, and trespass. In response, SRA-T filed a plea to the jurisdiction, arguing that it was immune from suit because the Appellants could not establish causation, could not establish that it had the requisite *mens rea* for a takings claim, and that the Appellants' claims were preempted by federal law. Following two hearings, the trial court granted SRA-T's plea. In its October 27, 2017 Order Granting Plea to the Jurisdiction, the trial court found: (1) Appellants' claims were preempted by federal law, and Appellants were collaterally estopped from asserting

6

those claims; (2) Appellants had not met their burden of proving intent; and (3) Appellants had not met their burden of establishing causation.

## II. Standard and Scope of Review

Sovereign immunity from suit defeats the trial court's subject matter jurisdiction and is properly raised in a plea to the jurisdiction. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). A court may not decide a case unless it has subject matter jurisdiction over the dispute. *Id*. at 226. A plea to the jurisdiction challenges the trial court's power to exercise subject matter jurisdiction over a claim. *Id.*; *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009).

We review a trial court's ruling on a plea to the jurisdiction using a *de novo* standard of review. *See State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Miranda*, 133 S.W.3d at 226. A plea to the jurisdiction is a dilatory plea, which is typically used to defeat a plaintiff's cause of action without regard to whether the claims have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). In our review, we look first to the plaintiffs' petition and liberally construe the pleadings to determine the pleaders' intent. *See Holland*, 221 S.W.3d at 642–43. We may also consider evidence in the record when it is pertinent to any relevant jurisdictional facts. *See id.* at 643; *Bland*, 34 S.W.3d at 555. "A plea should not be

7

granted if a fact issue is presented as to the court's jurisdiction, but if the relevant undisputed evidence negates jurisdiction, then the plea to the jurisdiction must be granted." *Holland*, 221 S.W.3d at 643 (citing *Miranda*, 133 S.W.3d at 227–28). When "evidence is presented with a plea to the jurisdiction, the court reviews the relevant evidence and may rule on the plea as a matter of law if the evidence does not raise a fact issue on the jurisdictional question, a standard that generally mirrors the summary-judgment standard." *Harris Cty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 798 (Tex. 2016) (citing *Miranda*, 133 S.W.3d at 227–28).

## III. Analysis

### A. Unconstitutional Taking

In their second amended petition, Appellants assert that their cause of action arose from SRA-T's unconstitutional taking of their property. In their first and third issues, Appellants contend the holding of *Arkansas Game and Fish Commission v. United States* is controlling authority, as the Court, under the facts of the case, held that a temporary flood could state a takings claim. 568 U.S. 23 (2012). Further, Appellants contend the evidence they submitted in response to SRA-T's plea raised issues of material fact on the question of causation.

A valid takings claim under article I, section 17 of the Texas constitution waives a governmental entity's right to sovereign immunity. *Kerr*, 499 S.W.3d at

8

799; *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001); *see also* Tex. Const. art. I, § 17(a). Plaintiffs have the burden to establish that a governmental entity's immunity has been waived. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003); *see also Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 648 (Tex. 2004) ("Because [plaintiff] failed to demonstrate that the nuisance he alleged amounted to an unconstitutional taking, sovereign immunity protects [the governmental unit] from [his] private-nuisance claim.").

The Texas Constitution provides "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made[.]" Tex. Const. art. I, § 17(a). To establish a constitutional takings claim, a plaintiff must prove: (1) the State intentionally performed certain acts in the exercise of its lawful authority; (2) the acts resulted in a "taking" or damaging of property; and (3) the taking was for public use. *Little-Tex Insulation*, 39 S.W.3d at 598; *State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941); *Sabine River Auth. of Tex. v. Hughes*, 92 S.W.3d 640, 641–42 (Tex. App.—Beaumont 2002, pet. denied) *(citing City of Houston v. Crabb*, 905 S.W.2d 669, 673 (Tex. App.—Houston [14th Dist.] 1995, no writ)); *Wickham v. San Jacinto River Auth.*, 979 S.W.2d 876, 880 (Tex. App.—Beaumont 1998, pet. denied). "Whether a 'taking' has occurred under inverse

9

condemnation is a question of law." *Bennett v. Tarrant Cty. Water Control & Improvement Dist. No. 1*, 894 S.W.2d 441, 448 (Tex. App.—Fort Worth 1995, writ denied). Similarly, under article I, section 17, a claim for nuisance is an alternative ground of recovery and an exception to sovereign immunity if the nuisance rises to the level of a constitutional taking. *City of Dallas v. Jennings*, 142 S.W.3d 310, 316 (Tex. 2004).

Although the arguments the Appellants' raise rely heavily on the Supreme Court's opinion in *Arkansas Game and Fish*, the case is distinguishable because the facts before the Court are much different from the facts that gave rise to the claims the Appellants are making here. 568 U.S. 23. *In Arkansas Game and Fish*, the Supreme Court expressly stated that its decision was not intended to create a blanket temporary-flooding exception to the requirements needed to prove takings claims. Instead, the Court stressed that takings claims turn on the specific facts that led to the flood. *Id*. at 34, 37.

We find the facts underpinning the Court's opinion in *Arkansas Game and Fish* to be factually distinguishable for at least three reasons. First, we note the opinion in *Arkansas Game and Fish* does not indicate that the flooding which occurred involved a hydroelectric power plant that was subject to regulations promulgated by FERC. *See id*. Second, the dam involved in *Arkansas Game and*

10

*Fish* was created for the specific purpose of controlling floods. *See id.* Third, the Court's opinion in *Arkansas Game and Fish* mentions that the Corps of Engineers, the governmental entity that operated the dam, had intentionally deviated on several occasions from the procedures that were spelled out in the dam's operations manual, which resulted in flooding downstream that differed in significant ways from the historical flood patterns experienced by landowners downstream from the dam. *Id.* at 27–28. Under those facts, the Court held that "government-induced flooding temporary in duration gains no automatic exemption from Takings Clause inspection." *Id.* at 38.

In contrast, the facts in this case involve areas around and downstream of the Project which experienced flooding due to a historic weather event. Addressing the storm, the FERC's post storm review of the Project's operation states FERC "determined that the project works were operated in a manner consistent with the license throughout the March 2016 storm event[.]"

Additionally, the Supreme Court in *Arkansas Game and Fish* never addressed issues about causation. *See id.* at 40 (noting that its decision did not require the Court to reach issues relating to question of causation, foreseeability, substantiality, or damages). In this case, however, the trial court's findings include findings that the SRA-T did not deliberately damage the Appellants' property. Moreover, to defeat

11

SRA-T's plea, the Appellants were required to establish that SRA-T's act of opening the gates was a proximate cause of the damage to their property. *See Hughes,* 92 S.W.3d at 642 (citing *Crabb*, 905 S.W.2d at 673); *Wickham*, 979 S.W.2d at 880; *see also Hale*, 146 S.W.2d at 736.

The evidence SRA-T produced supports the trial court's finding that the Appellants failed to meet their burden of proof on causation. Two affidavits from Travis Williams, an engineer, addressed causation. Williams's affidavits show that at its peak, the inflow into Toledo Bend Reservoir exceeded 600,000 cfs, while the peak discharge from the reservoir was approximately 207,000 cfs or 208,000 cfs. Thus, the underlying facts that gave rise to the flood event in this case are closely aligned with the facts that we discussed in two of our prior cases that involved flooding allegedly due to the operations of dams.[2] *See Hughes*, 92 S.W.3d at 642; *Wickham*, 979 S.W.2d at 883. Like those cases, SRA-T produced conclusive evidence establishing that it "never released more water than was entering the

---

[2] These prior cases were decided in the context of motions for summary judgment rather than pleas to the jurisdiction. *See Sabine River Auth. of Tex. v. Hughes*, 92 S.W.3d 640, 641 (Tex. App.—Beaumont 2002, pet. denied); *Wickham v. San Jacinto River Auth.*, 979 S.W.2d 876, 878 (Tex. App.—Beaumont 1998, pet. denied).

reservoir via rainfall."[3,4] *Hughes*, 92 S.W.3d at 642 (citing *Wickham*, 979 S.W.2d at 883). Moreover, correspondence describing FERC's post-incident review, along with Williams's affidavits, reveal significant flows of water were experienced "into the Sabine River from tributaries downstream of Toledo Bend Dam[.]" The evidence SRA-T presented also shows that several bayous located downstream from the Toledo Bend Dam were at record levels. Thus, the evidence before the trial court established that the water released by SRA-T from the Toledo Bend Dam did not flow directly onto Appellants' properties; rather, it flowed into the Sabine River, and mixed with water from other tributaries and rainwater below the dam before

---

[3] In their response to SRA-T's plea to the jurisdiction, Appellants included the affidavit of Keith Lindsey, a property owner, which simply alleges: "Prior to the construction of the Toledo Bend Reservoir, when the Sabine River would rise to a level that would breach its banks, the flow of water down the River would be very slow. The floods that have occurred after the construction of the Dam have been significantly greater and more destructive than prior to the Dam's construction. Specifically, the speed and velocity of the water flowing down the River and over my property has increased dramatically and caused more erosion to the land than ever before." These statements are concerned only with water flow before and after construction of the dam. They lend no support for the proposition that the discharges from Toledo Bend Dam on this occasion resulted in damage to Lindsey's property. Accordingly, Lindsey's statements are insufficient to create a fact issue on the requisite "taking" element.

[4] In their supplemental response to SRA-T's plea to the jurisdiction, the Appellants included the affidavit of an engineer, R.M. Airey Jr. The affidavit contained numerous allegations regarding the timing of the rising water levels, but the allegations contained in the affidavit are consistent with other evidence that the peak discharge from the dam was released at a rate of 207,644 cfs. Likewise, it does not create a fact issue on the requisite "taking" element.

overflowing the banks of the Sabine. This evidence allowed the trial court to conclude that SRA-T's actions did not constitute a "taking." *See Hughes*, 92 S.W.3d at 642; *Wickham*, 979 S.W.2d at 883.

We conclude the Appellants failed to establish that they have cognizable takings claims. Therefore, we hold the trial court did not err by finding that it did not have subject matter jurisdiction over those claims. We overrule the Appellants' first and third issues.

## B. Preemption

In their second issue, Appellants argue the trial court should have applied a field preemption analysis rather than a conflict preemption analysis in resolving whether it could hear their claims. "'Federal preemption is an affirmative defense that a defendant must plead and prove.'" *Simmons v. Sabine River Auth. La.*, 732 F.3d 469, 473 (5th Cir. 2013) (quoting *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th

14

Cir. 2012)).[5] There are three types of preemption: (1) express;[6] (2) field; and (3) conflict. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012); *Simmons*, 732 F.3d at 473. Federal law may impliedly preempt state law (1) if the statutory scope indicates Congress intended federal law or regulations to occupy the field exclusively, or (2) if state law conflicts with federal law. *Graber v. Fuqua*, 279 S.W.3d 608, 610 (Tex. 2009); *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex. 2001). "Conflict preemption occurs 'where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Simmons*, 732 F.3d at 473–74 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal citations omitted)); *see also Great Dane Trailers*, 52 S.W.3d at 743. Field preemption occurs when

---

[5] While a plea to the jurisdiction may not be the appropriate vehicle to address preemption issues, Appellants did not complain at the trial level or on appeal the plea was an inappropriate procedural vehicle, so any such argument is waived. *See* Tex. R. App. 33.1(a), 38.1(i); *Burlington N. & Santa Fe Ry. Co. v. City of Hous.*, 171 S.W.3d 240, 244 n.4 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Whitten v. Vehicle Removal Corp.*, 56 S.W.3d 293, 298 (Tex. App.—Dallas 2001, pet. denied). Therefore, we do not address whether SRA-T properly utilized a plea to the jurisdiction in this case. *See Whitten*, 56 S.W.3d at 298.

[6] The facts before us do not present a question of express preemption under the FPA.

"[t]he intent to displace state law altogether can be inferred from a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Simmons*, 732 F.3d at 473 (quoting *Arizona*, 567 U.S. at 399 (internal citations omitted)).

With respect to the Federal Power Act, "Congress clearly intended a broad federal role in the development and licensing of hydroelectric power." *California v. FERC*, 495 U.S. 490, 496 (1990). While the trial court never expressly identified the type of preemption analysis it applied in this case, we will assume, without deciding, that a conflict preemption applies.[7]

In *Simmons*, which also involved the same Project, the plaintiffs sued SRA-L for negligence, nuisance, trespass, unconstitutional taking, damage of property without just compensation, and due process violations under the Louisiana and United States Constitutions, seeking a remedy for a flood that occurred to their properties when the gates were opened to the dam. 732 F.3d at 472. Based on the facts involved in that flood, the Fifth Circuit concluded "the FPA preempts property damage claims based in state tort law where the alleged damage is the result of

---

[7] At least one federal district court has held claims similar to Appellants' were both field preempted and conflict preempted under the FPA. *See Carrington v. City of Tacoma*, 276 F. Supp. 3d 1035, 1045 (W.D. Wash. 2017).

16

'negligently' operating in compliance with a FERC-issued license." *Id.* at 474. "Because the state law property damage claims at issue here infringe on FERC's operational control," the Court held the plaintiffs' state law claims were preempted by federal law after applying a conflicts preemption analysis to their claims. *Id.* at 476.

Like the plaintiffs in *Simmons*, Appellants alleged in their second amended petition SRA-T "caused a deliberate release from the Toledo Bend Reservoir . . . *in accordance with its permit to operate*" and that it "fail[ed] to release water from the reservoir at a moderate rate prior to a rain event[.]" (emphasis added) Under the facts that were before the trial court in this case, it was shown that FERC, on multiple occasions, has refused to modify its regulations that govern how SRA-T is required to conduct its operations as related to measures that might in some situations mitigate the damage potential created by weather events that ultimately result in a flood. Essentially, Appellants fault SRA-T for acting within its license and operational plan, thereby seeking to impose an overarching duty on SRA-T to pre-release water in face of FERC's decisions declining to authorize such operations. *See Simmons*, 732 F.3d at 476 ("Plaintiffs allege that Defendants were negligent because they failed to act in a manner FERC had expressly declined to require."). The Fifth Circuit, however, has clearly stated that "FERC, not state tort law, must set the

17

appropriate duty of care for dam operators." *See id.* at 476; *see also* 16 U.S.C.A. § 803(c) (Westlaw through Pub. L. No. 115-231). In *Simmons*, the Fifth Circuit explained "[p]ermitting such state property damage claims in an attempt to force changes to a FERC-issued license would 'constitute a veto of the project that was approved and licensed by FERC.'" *See Simmons*, 732 F.3d at 477 (quoting *California*, 495 U.S. at 507).

In this case, the evidence in the trial court shows that FERC's operation manual provides for controlled releases of water from the Project when the level in the reservoir rises above 172.0 ft. msl. The evidence further shows that on March 8, 2016, the day before the rain event began, the Toledo Bend Reservoir was at 171.51 feet msl. Given that level, requiring SRA-T to pre-release water in anticipation of the storm that struck East Texas in March 2016 would have required SRA-T to operate the dam's gates in a manner that FERC had neither approved, nor licensed. Moreover, FERC had rejected more than one request made by citizens who asked that FERC authorize SRA-T to lower water levels in the reservoir in an effort to mitigate the adverse effects that might result during periods of heavy rain. Having failed in that effort, the case simply does not support the Appellants' argument that a duty should be imposed on SRA-T to require it to operate in a manner inconsistent with both the requirements of the law and the regulations that govern its operations.

18

In *Simmons*, the Fifth Circuit explained that "applying state tort law to set the duty of care for the operation of FERC-licensed projects would 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives' of the FPA." *See id.* at 477 (quoting *Arizona*, 567 U.S. at 399).

Appellants have argued that FERC did not have the authority to regulate SRA-T's operation of the Toledo Bend Dam. To impose a duty that FERC expressly rejected is an impermissible collateral attack on the decision FERC made during the relicensing process. We hold the Appellant's claims are conflict preempted. For that reason, we overrule their second issue.

## IV. Conclusion

We conclude Appellants' claims are conflict preempted, and they have not established a valid constitutional takings claim resulting in a waiver of sovereign immunity. We overrule the Appellants' issues and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on September 20, 2018
Opinion Delivered December 6, 2018

Before McKeithen, C.J., Kreger and Horton, JJ.

19