In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00109-CV
_____

SAN JACINTO RIVER AUTHORITY, Appellant

V.

ANGELES ACKLEY, ET AL, Appellees

_____

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 21-01-00841-CV

_____

MEMORANDUM OPINION

More than 450 property owners sued the San Jacinto River Authority ("SJRA") after Hurricane Harvey flooded their homes or businesses.[1] In their Original Petition, filed in Harris County, the Ackley Parties claim that the SJRA "intentional[ly], knowingly, and consciously" released water from Lake Conroe that

_____

[1] Other affected property owners also sued the SJRA. *See, e.g.*, *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618 (Tex. 2021); *San Jacinto River Auth. v. Gonzalez*, 657 S.W.3d 713 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

1

"cause[d] or exacerbate[d] downstream flooding," and that in causing or exacerbating this flooding, the SJRA took the Ackley Parties' property for public use "without adequate compensation" in violation of the Texas Constitution.[2] *See* Tex. Const. art. I, § 17(a). The Ackley Parties also claim that the SJRA had created a common law nuisance.

The SJRA filed an answer with a general denial and claim that the Ackley Parties' suit was barred by governmental immunity and the statute of limitations. The SJRA filed a Plea to the Jurisdiction, asserting governmental immunity and lack of evidence of causation and a lack of evidence that the taking was intentional. After the SJRA moved to transfer cases to the counties where the affected properties were located, the Harris County trial court severed and transferred the claims involving Montgomery County properties to Montgomery County;[3] Angeles Ackley, et al ("Ackley Parties") are the named Plaintiffs in the Montgomery County case. The SJRA then filed an Amended Plea to the Jurisdiction in Montgomery County, urging its previous governmental immunity claim based on its lack of causation and lack of intent arguments. Some Ackley Parties nonsuited their claims, and in March 2022, the Montgomery County trial court granted SJRA's Plea to the Jurisdiction as to the

---

[2] All hurricane references are to Hurricane Harvey, in 2017, unless otherwise noted.

[3] The Harris County trial court also severed and transferred claims involving property in Liberty, Jefferson, Brazoria, San Jacinto, Wharton, and Orange Counties to those respective counties.

fifty-nine Ackley Parties whose properties were upstream from the dam, including Angeles Ackley, but denied it as to the remaining 119 Ackley Parties.[4]

In this accelerated interlocutory appeal, the SJRA complains that the trial court erroneously failed to grant its Amended Plea to the Jurisdiction as to all the Ackley Parties. *See* Tex. R. App. P. 28.1; Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). Finding that the trial court erred in failing to grant the SJRA's Amended Plea to the Jurisdiction in its entirety, we affirm the trial court's Order dismissing the named Ackley Parties, but reverse and render its Order denying the SJRA's Amended Plea to the Jurisdiction as to the remaining Ackley Parties.

## I. Background Facts

"In 1973, the [SJRA] completed the construction of an earthen dam across the West Fork of the San Jacinto River (the "Lake Conroe Dam") to create Lake Conroe." *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 621 (Tex. 2021); *see San Jacinto River Auth. v. Gonzalez*, 657 S.W.3d 713, 718 (Tex. App.—Houston [14th Dist.] 2022, no pet.). The [SJRA] has operated and maintained Lake Conroe and the Lake Conroe Dam since that time. *See Medina*, 627 S.W.3d at 621; *Gonzalez*, 657 S.W.3d at 718. SJRA manages Lake Conroe's water level through its operation of the floodgates in the dam. At all times pertinent to this opinion, the

---

[4] All references to the trial court are to the Montgomery County trial court unless otherwise specified.

SJRA operated these gates according to a policy that ensured that during severe weather events, the maximum or "peak outflow" through the dam was less than the maximum or "peak inflow" into Lake Conroe at the lake's northern end for the duration of the severe weather event. The specific operating policy is set forth in the SJRA's formal "Gate Operation Policy[,]" which states:

> In the event that significant rainfall is occurring on the watershed contributing to Lake Conroe, or if it appears that significant rainfall is imminent, the reservoir operator should begin monitoring rainfall, lake levels, releases and weather forecasts. If the lake level increases above the normal pool elevation of 201, this gate operation policy should be implemented. However, the spreadsheet allows flexibility based on operator judgment for the gates to remain closed up to a water surface elevation of 202.6 feet. This flexibly allows the operator to hold water in Lake Conroe as they deem appropriate based on weather and downstream flooding conditions.

In late August 2017, Hurricane Harvey caused flooding in the greater Houston area and many homes and businesses sustained damage from those floods. Some affected property owners then sued SJRA, claiming:

> The SJRA's intentional, knowing, affirmative and conscious decision to conserve and then release Lake Conroe reservoir water between late August 2017 and early September 2017 intentionally, knowingly, affirmatively, and consciously inundated and flooded the West Fork San Jacinto River and many properties downstream of the dam, including those in Humble and Kingwood, and specifically flooded Ackley Parties' properties.

In other words, the Ackley Parties alleged that their properties would not have flooded as badly (or at all) but for the release of floodwaters through the Lake Conroe Dam. Yet the Ackley Parties provided no evidence, expert or otherwise, to

4

substantiate their claims that SJRA intentionally caused their homes to flood, or worsened the flooding from what it would have been had the dam not been in operation, as discussed in greater detail below.

## II. SJRA's Plea to the Jurisdiction, Ackley Parties' Response, and Evidence

In its Amended Plea to the Jurisdiction, the SJRA challenged the jurisdictional facts, rather than the Ackley Parties' pleadings. The SJRA claimed that its evidence showing that peak inflow exceeded peak outflow proved that its actions during the hurricane did not cause or exacerbate the Ackley Parties' flooding, but instead, reduced it by holding back some of the water that otherwise would have flowed downstream through the dam. It also distinguished the Ackley Parties' cited cases or harmonized them with its position, as we discuss in greater detail, below. The SJRA's Amended Plea to the Jurisdiction attached affidavits of three witnesses, as well as documentation showing the water levels, inflow, and dam releases; we likewise summarize these affidavits below.

The Ackley Parties responded to the SJRA's Amended Plea to the Jurisdiction, presenting their own interpretation of the SJRA's evidence and case authority, and setting forth their theory of causation: "had SJRA not opened the gates, [the Ackley Parties] would have experienced no or less flooding." The Ackley Parties attached emails, a news release issued by SJRA, the SJRA Lake Conroe Dam Emergency Action Plan by Freese and Nichols, Lake Conroe Dam Breach Analysis

by Freese and Nichols, the Conroe Dam Gate Operation Policy by Freese and Nichols, letters regarding discovery, maps, charts, and other documents to their response to SJRA's Amended Plea to the Jurisdiction. But the Ackley Parties did not include expert witness testimony, by deposition or affidavit, interpreting the underlying data or explaining how the documents raise a fact issue to refute the SJRA's position.[5]

## A. Affidavit of Jace Houston

Jace Houston ("Houston"), SJRA's General Manager, confirmed that the SJRA retained Freese and Nichols, Inc. to develop SJRA's Gate Operations Policy that would foster SJRA's purpose of "provid[ing] water to downstream customers, reduc[ing] the natural flow in the river during a storm event, pass[ing] floodwaters through the Dam as safely as possible, and protect[ing] the structural integrity of the Dam's earthen embankment and gates." To that end, and to conform to our opinion in *Wickham v. San Jacinto River Authority*, the SJRA directed Freese and Nichols to develop a policy that would ensure "that, when releasing water, the peak outflow

---

[5] Due to an unforeseen conflict of interest, the Ackley Parties had to select an alternate expert witness a few months before the March 11, 2022, hearing on the SJRA's Amended Plea to the Jurisdiction, but the Ackley Parties did not provide a report or affidavit from that expert. At the hearing, the trial court asked counsel for the Ackley Parties whether they needed more time for additional discovery. But, the Ackley Parties declined.

from the Dam never exceeded peak inflow into the reservoir over the course of a storm event." 979 S.W.2d 876 (Tex. App.—Beaumont 1998, pet. denied).

Houston averred that during the Hurricane Harvey severe weather event, the SJRA followed the policy Freese and Nichols had developed; consequently, the peak outflow from the dam (79,141 cubic feet per second ("cfs")) never exceeded the peak inflow into the reservoir (129,065 cfs). Houston stated that his Exhibit 1, attached to his affidavit, supports his statement that peak outflow never exceeded peak inflow during this severe weather event.

## B. Affidavit of Hector Olmos, P.E.

Hector Olmos ("Olmos") described his educational and professional qualifications, which include a bachelor's degree in civil engineering and a master's degree in water resources. As of the date of his affidavit, Olmos was a vice president of the engineering firm of Freese and Nichols, Inc., where he had worked in the water resources and stormwater management groups since 2005. In this capacity, Olmos had the opportunity to develop "hydrologic and hydraulic models for small to large watersheds, hydrologic and hydraulic evaluation of dams, development of gate operation plans, dam breach analyses, evaluation of hydraulic systems after significant storms, and development of flood mitigation projects." This professional experience had given him "a broad base of technical expertise in the fields of hydrology and hydraulics."

Since 2009, Olmos has worked with the SJRA to develop and update the SJRA's Gate Operations Policy and Emergency Action Plan; Olmos also has consulted on dam operations. Freese and Nichols prepared an initial Gate Operations Policy in 2010, but modified that policy in April 2017, "to better optimize and balance the lake levels and releases from the dam."

Olmos described the dam operations and surface water flow both in general terms and during Hurricane Harvey, noting that the Gate Operations Policy was "designed to ensure that the dam's gates are operated consistently across various scenarios, contemplating different inflow quantities." Olmos further noted that the Policy "sets forth the guidelines by which the gates will be operated in such a manner so as to ensure that peak outflow in any significant rain event is lower than the lake's peak inflow during such rain event."

> To illustrate this point, Olmos stated:
>
> at a lake elevation level – 203.0 feet – the Policy recommends a target release rate of 35% of the peak inflow into the lake, at a lake elevation level of 206.5 feet, it recommends a maximum release rate of 75% of the peak inflow into the lake, at a lake elevation level of 208.5 feet, it recommends a maximum release rate of 80% of the peak inflow into the lake.

As Olmos described the dam, the lake, and surrounding waterways, the dam forms Lake Conroe, a water-supply reservoir, by damming the west fork of the San Jacinto River. Downstream from the dam, several creeks, including Lake Creek, Spring Creek, and Cypress Creek, flow into the San Jacinto River and both the east

8

and west forks of the river flow into Lake Houston. Olmos also described the five floodgates that release water from Lake Conroe. These gates have a convex surface that faces the lake, while the pivot point of the gates faces downstream; when viewed from the side, these gates "are shaped like a slice of pie[.]" When the gates are raised, water flows under them. Olmos cautioned against allowing the water level in the lake to overtop the dam, explaining that in this scenario, the weight of the water would prevent the gates from opening, and water would flow "uncontrolled over the top of the gates, and indeed, likely would have caused a failure of the gates, resulting in a catastrophic release."

With specific reference to gate operations and decisions during the hurricane, Olmos stated that Freese and Nichols monitored the situation along with the SJRA. Freese and Nichols conducted "real-time monitoring of the lake levels, the dam gate operations, and the estimated inflow and outflow from the lake[,]" as did the SJRA. Although the SJRA's figures reflect some minor discrepancies when compared with Freese and Nichols's figures, these differences, according to Olmos, "do not impact the conclusions that can be drawn from the data[.]"

Olmos stated that at 6:00 a.m. on August 26, 2017, Lake Conroe had a pool level of 200.40 feet, or 0.60 feet below its normal level. The SJRA then detained enough water flowing into the lake to allow the lake to reach its normal pool level of 201.00 feet. When the pool level reached 201.04 feet, or 0.04 feet above normal

9

pool elevation, the SJRA made its first stormwater release; this release took place at 12:15 a.m. on August 27, 2017, and according to the SJRA's computations, consisted of 529 cfs, while the inflow into Lake Conroe at that time was 13,777 cfs. Lake Conroe did not return to normal pool elevation until 11:45 p.m. on September 17, 2017.

According to additional SJRA calculations, the maximum rate of inflow into Lake Conroe during the Hurricane Harvey weather event was 129,065 cfs, yet the maximum outflow rate through the dam was 79,141 cfs; Freese and Nichols's calculations support the conclusion that during Hurricane Harvey, "Lake Conroe released less water than what drained into it."

The attachments to Olmos's affidavit document the dates and times of lake level readings, total inflow, discharge, and gate opening settings from 10:00 p.m. on August 26, 2017, through 11:45 p.m. on September 17, 2017. There are many inflow/outflow readings during the period beginning August 28, 2017, and for several days running, that show more water being released from the dam than there was water inflowing to the lake. While the Ackley Parties make assertions in their briefing that this variance between inflows and outflows is evidence of intentional flooding, they presented no expert testimony to the trial court to rebut the SJRA's expert testimony (found in the affidavits of Hector Olmos, Jace Houston and Mark Forest) that operating the dam in a manner in which the peak outflows did not exceed

10

the peak inflows actually prevented worse flooding than otherwise would have occurred to the downstream parties.

## C. Affidavit of Mark Forest, P.E.

After Hurricane Harvey, the SJRA retained Mark Forest ("Forest") an engineer with experience in "hydrologic and hydraulic modeling, flood control and stormwater planning and design and floodplain management." Forest set out his educational and professional qualifications, noting that he has a degree in hydrology and that among his other achievements, he has been "directly responsible for preparing or managing drainage and flood control designs and for small and large projects" in Texas and elsewhere in the United States and Canada. He also has served as an expert witness in the areas of hydrologic and hydraulic modeling and flow in several cases, including fifteen lawsuits against the SJRA arising out of Hurricane Harvey flooding.

Forest has reviewed the San Jacinto watershed and described the flow of the waterways involved. He specifically noted:

> [] Lake Conroe was formed by impounding the West Fork San Jacinto River behind a dam. Runoff water flowing into Lake Conroe and released from the Lake Conroe Dam flows directly into the West Fork San Jacinto River.

> [] After entering the West Fork San Jacinto River, any water released from Lake Conroe moves downstream and combines with flows from multiple other watercourses.

11

Regarding the current suit, Forest supervised a project tasked with evaluating rainfall data, streamflow data, topographic data, and bathymetric data from multiple sources to assess and model the riverine flood that occurred during Hurricane Harvey.[6] According to Forest, they performed these evaluations using "industry standard" software that has "been rigorously tested and well documented." Forest and his team produced models of several actual and hypothetical flooding scenarios, and concluded the following:

(1) Hurricanes Harvey and Katrina are the costliest recorded tropical cyclones, each costing $125 billion in damage.

(2) During Hurricane Harvey, from August 25 to August 29, 2017, the average rainfall in the San Jacinto River watershed that contributes to Lake Conroe was about twenty to thirty inches.

(3) Although there was no outflow from Lake Conroe until "mid-day on August 27, 2017[,]" by that time, "the West Fork San Jacinto River at I-69 (Highway 59) had already risen 14 feet in response to flows in the West Fork without any contribution from Lake Conroe releases." To reach that location, Lake Conroe releases take approximately thirty hours to travel thirty-eight miles, meaning that the twenty-foot rise in water level recorded at mid-day on August 28, 2017, was not attributable to any Lake Conroe Dam releases. Consequently, the "major flooding was already occurring throughout the Kingwood area" also could not be traced to Lake Conroe dam releases.

(4) During Hurricane Harvey, Lake Conroe Dam reduced the peak floods downstream from the dam by storing enough water in Lake Conroe to ensure that maximum peak inflow into the lake exceeded maximum peak outflow through the dam.

---

[6] Forest defined the riverine flood as the flood from waterways, distinguishing it from rainwater that fell directly onto land or flowed from storm sewers or streets.

(5) Below the Lake Conroe Dam, "the West Fork [of the] San Jacinto River converges with several tributaries, including Lake Creek, Spring Creek and its tributary, Cypress Creek, and various other named and unnamed waterways[,]" but water "released from the Lake Conroe Dam is not released into Lake Creek, Spring Creek Cypress Creek, or the East Fork of the San Jacinto River."

(6) Ten of the Ackley Parties remaining in this case (Judith Crumpler, James Jugon, Brandon Brown, Sarah Opaska, Zainab Hembree, Gary Rees, Robert Wells, Renee and Omar Neumann, and Edward Verweij) own properties on Spring Creek or its tributaries.

(7) The ten Ackley Parties named in paragraph 6, above, experienced no impact from the Lake Conroe Dam releases because their properties were located "[o]n Spring Creek [or its tributaries] beyond upstream limits of influence from Lake Conroe watershed." Comparing the flooding levels in these areas with the "infinite Conroe scenarios[,]" where the SJRA released no floodwater through the dam during the hurricane, reveals that there is "no difference" between these two outcomes. Consequently, Forest reasoned, releases through the Lake Conroe Dam did not impact these Ackley Parties because their properties would have flooded to the same degree regardless of floodwater releases.

(8) Five of the Ackley Parties (Solveig and Thomas Matek, Colin Gray, Eloisa Gamez, and Marilyn Bullock) own property on Lake Creek, outside the upstream limits of the Lake Conroe watershed.

(9) The Ackley Parties named in paragraph 8, above, experienced no impact from the Lake Conroe Dam releases because their properties were located on Lake Creek beyond upstream limits of influence from the Lake Conroe watershed. Comparing the flooding levels in these areas with the "infinite Conroe scenarios[,]" where the SJRA released no floodwater through the dam during the hurricane, reveals that there is "no difference" between these two outcomes. Releases through the Lake Conroe Dam therefore did not impact these Ackley Parties because their properties would have flooded to the same degree regardless of floodwater releases.

(10) Any flooding of four of the remaining Ackley Parties' properties (Brian White, Elizabeth Kirkpatrick, Jonas Ekman, and the Thunder Gun Range) was due to urban runoff rather than the San Jacinto River.

(11) In the hypothetical situation where Lake Conroe Dam released no water until after the hurricane ended, the water in Lake Conroe would have overtopped the dam by approximately three feet. In that case, the water level "would have compromised the integrity of the dam embankment and created the potential risk of dam failure due to overtopping. A dam failure would have been far more consequential to the downstream reach compared to the observed event."

Forest verified the accuracy of his models by comparing the results of his computer models to flood depths and patterns documented during the hurricane. Again, the Ackley Parties presented no expert testimony to rebut Mr. Forest's analysis and conclusions.

### III. Ackley Parties' Takings Claims

The Ackley Parties allege that the SJRA damaged their property in violation of the Texas Constitution by operating the Lake Conroe Dam in a way that "cause[d] or exacerbate[d]" flooding resulting from Hurricane Harvey. They further allege that this damage constituted a taking without either their consent or adequate compensation.[7] They contend that this alleged taking entitles them to money damages for costs of repair, lost use, reduced market value, and the like.

---

[7] The SJRA does not contend that Ackley Parties consented or that they have received "adequate compensation," only that they cannot prevail on their takings claim due to the SJRA's immunity.

14

In response, the SJRA filed an answer, a Plea to the Jurisdiction, and later filed an Amended Plea to the Jurisdiction in Montgomery County, claiming that as a governmental entity, it enjoys immunity from suit, and that the trial court therefore lacks jurisdiction to adjudicate the Ackley Parties' claims. The SJRA specifically challenge the causation and intent elements of the Ackley Parties' takings claims.

## A. Standard and Scope of Review

Sovereign and governmental immunity from suit defeat the trial court's subject matter jurisdiction and are properly raised in a plea to the jurisdiction. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). A court may not decide a case unless it has subject matter jurisdiction over the dispute. *Id.* at 226. A plea to the jurisdiction challenges the trial court's power to exercise subject matter jurisdiction over a claim. *Id.*; *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 621–22 (Tex. 2009).

We review a trial court's ruling on a plea to the jurisdiction using a de novo standard of review. *See State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *Miranda*, 133 S.W.3d at 226. When, as here, a party challenges the existence of the jurisdictional facts, the court can consider evidence to resolve the dispute of those facts. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). In those situations, a trial court's review of the plea to the jurisdiction "mirrors that of a traditional summary judgment motion." *Id.* (citing *Miranda*, 133

15

S.W.3d at 228; Tex. R. Civ. P. 166a(c)); *see also Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 798 (Tex. 2016).

The defendant/movant carries the initial burden to meet the summary judgment proof standard. *Garcia*, 372 S.W.3d at 635; *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018). Once the governmental entity submits undisputed evidence in support of its plea to the jurisdiction negating an essential element of the plaintiff's prima facie case, the burden shifts to the plaintiff to present evidence raising a fact issue. *See Garcia*, 372 S.W.3d at 642–43; *Gonzalez*, 657 S.W.3d at 725–26 (in a case involving the same releases from the Lake Conroe Dam, explaining that once SJRA presented evidence negating causation, to avoid dismissal, the plaintiffs had the burden to submit evidence disputing SJRA's evidence as to causation and raising a fact issue as to whether they can prove causation on their takings claims). When the evidence relevant to this jurisdictional issue is undisputed and fails to raise a fact question on the jurisdictional issue, the issue may be ruled on as a matter of law. *See Garcia*, 372 S.W.3d at 642–43; *Gonzalez*, 657 S.W.3d at 725–26.

**B. Applicable Law**

"Sovereign and governmental immunity protect the state and its political subdivisions, respectively, from suit and liability absent the state's express waiver." *Medina*, 627 S.W.3d at 622 (citation omitted). The Texas Constitution provides such

16

an "express waiver" by stating: "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person[.]" Tex. Const. art. I, § 17(a). When the government has taken or damaged a person's property for public use, the property owner may sue, claiming inverse condemnation and seeking just compensation for his loss. *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004) (citations omitted) (discussing inverse condemnation claims). "Whether a 'taking' has occurred under inverse condemnation is a question of law." *Sabine River Auth. of Tex. v. Hughes*, 92 S.W.3d 640, 642 (Tex. App.—Beaumont 2002, pet. denied) (quoting *Bennett v. Tarrant Cnty. Water Control and Improvement Dist.*, 894 S.W.2d 441, 448 (Tex. App.—Fort Worth 1995, writ denied)) (other citations omitted).

To demonstrate an actionable taking and defeat governmental immunity, a plaintiff must prove: 1) the State intentionally performed certain acts in the exercise of its lawful authority; 2) the acts resulted in a "taking" or damaging of property; and 3) the taking was for public use. *See Waller v. Sabine River Auth. of Tex.*, No. 09-18-00040-CV, 2018 WL 6378510, at *4 (Tex. App.—Beaumont Dec. 6, 2018, no pet.) (mem. op.) (citations omitted). Absent evidence of each of the elements recited above, the defendant's immunity remains intact, and the trial court must dismiss the case for lack of subject matter jurisdiction. *See Gonzalez*, 657 S.W.3d at

17

725–28 (reversing the trial court's denial of the SJRA's Plea to the Jurisdiction under an analogous evidentiary posture of the case).

**C. Analysis**

As previously noted, the SJRA's Amended Plea to the Jurisdiction focus on the causation and intent elements of a takings claim. With regard to causation, the SJRA presented evidence that proved that the peak inflow into Lake Conroe during Hurricane Harvey exceeded the peak outflow during that storm. The SJRA relied on *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005) for the proposition that a plaintiff must prove that a governmental entity which relied on guidance from experts, with respect to scientific or technical issues, lacks the requisite intent necessary to prove a takings claim.

The Ackley Parties, conversely, argued both in the trial court and on appeal that immunity based on the peak inflow versus peak outflow comparison misstates the law. The Ackley Parties, instead, rely on *Gragg* and other cases, arguing that "[f]or a case involving floodwater effects, the cause-in-fact prong can be established by evidence that a governmental entity's affirmative act changed the character of the floodwater." However, in response to the motion in the trial court, the Ackley Parties agreed that *City of Keller,* above*,* stands for the proposition that when the government acts in reliance on expert scientific or technical opinions that its actions will not cause increased downstream flooding, and has no other knowledge to the

18

contrary, there is no intent. *See City of Keller*, 168 S.W.3d at 829–30. The Ackley Parties argue in the trial court and on appeal that, at specific moments in time, the outflow from the dam exceeded the inflow, thus negating the SJRA's argument addressing the relative peak inflow and peak outflow. This is contrasted with SJRA's evidence establishing that the applicable measurement of peak outflow is at its single highest point for the event's duration compared to the single highest measurement of peak outflow during the event's duration, which does not occur simultaneously.

We begin by observing that the SJRA has produced sufficient evidence to defeat the causation element of a takings claim by submitting evidence filed with the motion to dismiss for lack of jurisdiction. SJRA's evidence shows that during the hurricane, the peak inflow into Lake Conroe surpassed the peak outflow through the dam. The SJRA evidence shows that the Ackley Parties' properties "would have flooded during Harvey even if the Authority had released no water at all from Lake Conroe[,]" and the Ackley Parties "cannot prove causation on their takings claims." *See Gonzalez*, 657 S.W.3d at 725–26 (citing *Garcia*, 372 S.W.3d at 642–43). In the absence of evidence to the contrary, this evidence establishes SJRA's causation defense as a matter of law. *Id.* Consequently, to avoid dismissal of their takings claims based on governmental immunity, the burden shifted to the Ackley Parties so they "had the burden to submit evidence disputing the [SJRA's] evidence as to causation and raising a fact issue as to whether they can prove their causation on

19

their takings claims." *Id.* (citing *Garcia*, 372 S.W.3d at 642–43; *Miranda*, 133 S.W.3d at 227–28). Therefore, SJRA prevailed under the applicable summary judgment standard, and the trial court should have granted the SJRA's Amended Plea to the Jurisdiction unless the Ackley Parties offered sufficient evidence to raise a fact issue, which they failed to do. *See id.*; *see also Kerr*, 499 S.W.3d at 798–99; *Garcia*, 372 S.W.3d at 642–43; *Miranda*, 133 S.W.3d at 227–28.

Although Ackley Parties attached evidence to their Response to Defendant's Amended Plea to the Jurisdiction, the Ackley Parties, unlike the SJRA, included no expert analysis of the evidence they included in their Response to attempt to meet their burden of showing that their flood damage would have been diminished but for the SJRA's stormwater release. *See Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (discussing causation in the context of malpractice claims); *Palma v. Chribran Co.*, 327 S.W.3d 866, 869–70 (Tex. App.—Beaumont 2010, no pet.) (discussing need for expert testimony regarding "how water travels after being absorbed by the ground"). As the SJRA expert's evidence shows, water comes from many other tributaries or rivers that flow into the San Jacinto River below Lake Conroe, which are not under the control of the SJRA. Here, the Ackley Parties failed to present any evidence, expert or lay testimony, showing how the operation of the dam by the SJRA caused the downstream homes to flood, or flood more than they otherwise would have flooded in this rain event, had the dam not been operated in the manner

20

in which it was operated. The trial court Judge cannot speculate as its own expert to reinterpret the SJRA expert's data to reach its own conclusions as to causation—neither can this court of appeals. As the Ackley Parties did not provide such evidence, they did not raise a fact issue, and the trial court should have granted the SJRA's Amended Plea to the Jurisdiction. *See Kerr*, 499 S.W.3d at 798–99; *see also Gonzalez*, 657 S.W.3d at 725.

The Ackley Parties' reliance on *Gragg* is likewise unpersuasive. *See Gragg*, 151 S.W.3d at 546. Not only was *Gragg* based on the appeal of a jury verdict, as opposed to the summary judgment standard we apply in this case, but the *Gragg* dam operator "acknowledged that on at least one occasion, the District released more than 23,000 cfs in excess of what natural peak flows would have been from Richland and Chambers Creeks." *Id.* at 552. The SJRA did not make such an acknowledgment in this case.

The Ackley Parties have observed that for a time, the outflows from the Lake Conroe Dam were greater than the inflow into the lake (but not the peak inflows). Even so, the Ackley Parties have failed to provide expert evidence explaining why inflow versus outflow (as opposed to peak inflow versus peak outflow) caused or exacerbated the flooding of their properties. *See Gonzalez*, 657 S.W.3d at 726; *see also Garcia*, 372 S.W.3d at 642–43; *Miranda*, 133 S.W.3d at 227–28. It was the

21

Ackley Parties' burden to do so once SJRA conclusively negated causation with their evidence. *See Gonzalez*, 657 S.W.3d at 726.

We sustain the SJRA's first issue.

In view of the SJRA's evidence negating the causation element of the Ackley Parties' takings claims, we need not consider the SJRA's second issue: the intent element of the Ackley Parties' takings claims. *See* Tex. R. App. P. 47.1.

## IV. Ackley Parties' Nuisance Claim

In addition to their takings claims, the Ackley Parties alleged that the SJRA had created a nuisance by flooding their property. In support of their nuisance allegation, the Ackley Parties claim that it, like their takings claims, survived the SJRA's Amended Plea to the Jurisdiction.

### A. Standard of Review

The SJRA's Amended Plea to the Jurisdiction addresses both the Ackley Parties' takings and nuisance claims. Since we review a plea to the jurisdiction under a de novo standard, we apply the same standard of review to the Ackley Parties' nuisance claim that we apply to their takings claim. *See Holland*, 221 S.W.3d at 642.

### B. Applicable Law and Analysis

"[N]uisance liability arises only when governmental immunity is clearly and unambiguously waived." *City of Dall. v. Jennings*, 142 S.W.3d 310, 316 (Tex. 2004). This may occur when a nuisance rises to the level of a constitutional taking.

22

*Id.* (citation omitted). A nuisance is defined as "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Wickham*, 979 S.W.2d at 880 (citations omitted). Regardless of the Ackley Parties' discomfort or annoyance, however, the Ackley Parties' nuisance claim cannot succeed unless it "rises to the level of a constitutional taking." *Waller*, 2018 WL 6378510, at *4; *see also Gonzalez*, 657 S.W.3d at 717–18, 728 (concluding that "governmental immunity bars [the Ackley Parties'] claims against [SJRA] . . . for nuisance that does not allegedly rise to the level of a taking."). We have already concluded that SJRA negated the element of causation required to be held liable for a takings claim under Article I, Section 17 of the Texas Constitution, which is the only basis the Ackley Parties assert gives rise to a potential waiver of immunity. *See Jennings*, 142 S.W.3d at 316. Since the Ackley Parties cannot prove a viable takings claim, "there is no waiver of governmental immunity for their takings claims or for their nuisance claims that allegedly rise to the level of a taking, and the trial court lacks jurisdiction over these claims." *Gonzalez*, 657 S.W.3d at 728 (citing *Jennings*, 142 S.W.3d at 315–16).

## V. Conclusion

The SJRA conclusively negated the causation element of the Ackley Parties' takings claims. Once the burden shifted to the Ackley Parties, they failed to present

23

evidence creating a fact issue as to causation. Consequently, the Ackley Parties failed to establish their constitutional takings claims. The SJRA likewise has negated the Ackley Parties' nuisance claims, which depends on its takings claims.

We therefore affirm that part of the trial court's Order dismissing fifty-nine Ackley Parties' claims with prejudice. We reverse that part of the trial court's Order denying the SJRA's Amended Plea to the Jurisdiction as to the remaining Ackley Parties and render a decision dismissing the remaining Ackley Parties' claims for want of jurisdiction.

AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.

JAY WRIGHT
Justice

Submitted on December 6, 2022
Opinion Delivered October 17, 2024

Before Johnson, Wright and Chambers, JJ.

24