**Opinion issued November 26, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00013-CV

————————————

**SAN JACINTO RIVER AUTHORITY, Appellant**

**V.**

**VICENTE MEDINA; ASHLEY MEDINA; ARIS ANTONIOU; TODD ALLEN; DEAMON BEEMAN; PAULA S. BEEMAN; ROBERT E. BURKHALTER; ARMANDO CHAVEZ; JOSEPH C. MIRE; BILLY W. STAGGS; SHIRLEY L. STAGGS; HENG TRAIN; RICKY SMART; DIANNA MARLEN WATSON; STEVEN J. RONAN; PATRICIA W. RONAN; SYED SHAH; ERIC WHITE; ROSS TAYLOR; BRIAN WHITE; KATHRYN TROUTMAN; JOSEPH R. BURBANO; LINDA S. BURBANO; JUDY F. LEDAY; WALLACE J. LEDAY; VICKIE SULLIVAN; JACK ABSHER; KAREN ABSHER; PETER CLARKE; PATRICIA CLARKE; ERNEST HAUSER; BEVERLY HAUSER; JOHN HITE; LOUISE HITE; ALLIE HORTON; KEVIN HORTON; STEVEN MALKEY; KATHRYN MALKEY; KEVIN POPE; KAREN POPE; ANDREA STATUM; MICHAEL STATUM; ANDRES ABDALA; MARIA ABDALA; BRYAN CASTLEBERRY; AMANDA CASTLEBERRY; THORNTON HOUSE; BARBARA HOUSE; CATHY JORDAN; JOHN JORDAN; CHRISTOPHER KETHAN; LESLIE KETHAN; ALAN LOVELACE; SIDONIA LOVELACE; BARBARA MOLAISON; RICHARD MOLAISON; RALPH SPEARS; JUDY SPEARS; DAVID ANDREWS; BRENDA ANDREWS;**

HARRY CARPENTER; VELDA CARPENTER; LORI MCDOWELL; FRANK MCDOWELL; JEFF NORRIS; LIZZETTE NORRIS; EMILE CENTENO; TINA CENTENO-LEWIS; EVELYN GILDER; TERRI DAVIS; JUANITA DUNCAN; CLYDE DUNCAN, SR.; NORTHSHIRE INVESTMENTS HUMBLE, INC.; SHAWN KELLY; OLGA STRONG; EDWARD D. STRONG; MARLY BERNE; JOHN DUHON; JOAN DUHON; DORTE KAMPFER; JACK SAINT JOHN; HOK TRAIN; MAYER ASSOLIN; MARIA GABRIELLA PEREZ, DDS; DEERBROOK FAMILY DENTISTRY, P.C.; ROBERT L. BEASLEY; KIMBERLY S. BEASLEY; NICHOLAS L. BRADEN; PEGGY J. GLAZE; SHANNON E. CRAWFORD; RONALD CHARLES CROSSMAN; HALENE CROSSMAN; CLIFTON B. CURRIN, JR.; DEBORAH H. CURRIN; KENNETH B. DOMINIQUE; MARY J. DOMINIQUE; RICHARD M. ENGEL; BRENDA ENGEL; INGRID E. FEDER, INDIVIDUALLY AND AS CO-TRUSTEE OF THE ALAN H. BRIGHTMAN, II REVOCABLE LIVING TRUST U/T/A FEBRUARY 26, 1996, AS AMENDED AND RESTATED; ANDREW W. FERGUSON; MARION A. FERGUSON; JOE S. GAZZANA; JULIE A. GAZZANA; STEPHEN L. GOODWIN; DIANE F. GOODWIN; JOYCE S. GOULD; BRIAN E. GROOM; BEVERLY A. GROOM; ELPIDA RECHELLE GRYPARIS; JOHN O. HEARD; KATHRYN HEARD; CARL R. HOPPES; CARMELITA HOPPES; RICHARD B. HUGHEY; KAREN N. HUGHEY; SANDRA L. INGRAM; REBECCA W. JOHANSEN; GRANT JAMES; THOMPSON KEILLOR; ALISON MARGARET KEILLOR; MARY LYNN KOENIG; JOHN J. LAVEZZARI; GAIL LAVEZZARI; NEIL LEUCK; JILL TISCHBEIN; RAYMOND LITTLE; HOLLY LITTLE; LOUISE T. MANN; JULIA ANN PAUL; JOHN F. PEARCE; LINDA C. PEARCE; KLAUS M. PISTORIUS; SUSAN PISTORIUS; MATTHEW PRUCHA, INDIVIDUALLY AND AS CO-TRUSTEE OF THE PRUCHA LIVING TRUST UTD SEPTEMBER 16, 2005; DEBORAH PRUCHA, INDIVIDUALLY AND AS CO-TRUSTEE OF THE PRUCHA LIVING TRUST UTD SEPTEMBER 16, 2005; HUBERT ROBERTS; STACY RONEY, AS INDEPENDENT EXECUTOR OF THE ESTATE OF NANCY PARRIGIN, DECEASED; CHARLES W. SANDFORD; KAREN SANDFORD; DAVID SPARKS; JENNIFER SPARKS; JAMES STEVEN THOMAS; JUNE CAROL THOMAS; DARREL D. TICKNER; DEANITA TICKNER; ANDREW T. TIMURA; MARY P. TIMURA; FRANTISEK UNCAJTYK; ROBERT C. YOUNG; SHERYL L. YOUNG; JOSEPH L. NOLAN; MARY K. NOLAN; ROBERT KARL MABESOONE; CLAUDIA JEAN MABESOONE; DAVID F. BAILEY, JR.; DANYALE R. BAILEY; DAN H. HILL; ROXANNE HILL; JEAN MARTIN; CHARLES A.

CAMPBELL III; KYLE P. CAMPBELL; THE QUIET WING, LLC; KINGWOOD CHIROPRACTIC CLINIC, P.C. D/B/A CAMPBELL CHIROPRACTIC CLINIC; ALBERT DION II; MELISA DION; TROY AHRENS; AMY AHRENS; CHARLES J. ARGENTO; KATHARINE ARGENTO; KRISTOFER D. BUCHAN; MELISSA BUCHAN; BRANDON BURGESS; DIANE BURGESS; JEFF ENSLEY; ANNE ENSLEY; JOHN FAULKINBERRY; LAURIE D. FAULKINBERRY; JOHN R. FREEMAN; BARBARA FREEMAN; KURT V. HUSEMAN; DEBBIE L. HUSEMAN; WILLIAM E. LANGE; JENNIFER WOOD LANGE; DAVID L. MILLER; SALLY T. MILLER; WILLIAM J. NAPIER, JR.; CHRISTINE D. NAPIER; JAMES L. REVEL; LOUISE W. REVEL; BERNARD F. RYAN; CECILIA M. RYAN; DANA M. STEGALL; DANNY C. STEGALL; TODD R. SUMNER; KIMBERLY A. SUMNER; MARK D. TEMPLE; TRACY C. TEMPLE; RICHARD C. BARKER; TRINA BARKER; DOUGLAS H. WOODUL; MARY S. WOODUL; JAMES A. DAVITT; KIM L. DAVITT; PAUL W. BARKER; DIANA E. BARKER; JUSTIN D. PAYNE; NICOL S. PAYNE; TOBY A. POTTER; KACY A. POTTER; WILLIAM BASHAM; MARIAN BASHAM; BRADLEY D. FORSBERG; LORI-LYNN FORSBERG; NATHAN KROEKER; GENEVIEVE KROEKER; JOHN C. NICHOLSON; RACHEL C. NICHOLSON; RICHARD B. WILSON; JANET G. WILSON; DUNCAN R. RHODES; KELLY A. RHODES; DR. MERRIMON W. BAKER; TOBIN J. BROWN; JANET DIAZ; KLCL KINGWOOD COMMONS, LLC; VILLAGE GREEN KINGWOOD COMMONS, LLC; KARIM BENLAZIZ; AWATEF TEBBANI; CORBERT BROCKER; CYNTHIA BROCKER; BRUCE BROWN, JR.; CYNTHIA G. BROWN; JAMES W. CALDWELL; KRISTEN A. CALDWELL; MICHAEL W. CHAMBERLAIN; LYDIA CHAMBERLAIN; MICHAEL F. COMPOSTO; GUDLANG L. COMPOSTO; ROSARIO COMPOSTO; DONNA COMPOSTO; ANIBAL DE JESUS; HILDA DE JESUS; ROSWELL DIXON; PETRINA S. DIXON; VICKI H. HITZHUSEN; WILLIAM J. HITZHUSEN; GREGORY S. KENDRICK; AMY L. KENDRICK; RICHARD KREGER; VICKI KREGER; VANCE KREIDER; PAUL MATEJOWSKY; MARIAH MATEJOWSKY; EVA R. MEREDITH; MANFRED QUENTEL; URSULA QUENTEL; AZHAR SINDHU; TEXAN LIVE MEDIA, LLC; SUNIL THAKUR; SHUBHA THAKUR; ERIC VOGL; LISA VOGL; MICHAEL A. BURNEY; GINGER R. BURNEY; CHARLES A. CASEY; MAUREEN S. CASEY; JOHN M. DANIEL; CAROLYN F. DANIEL; THOMAS LEE; CHRISTINE LEE; ROBERT C. MILES; SHERRY K. MILES; JACK L. NOWLIN; LINDA S. NOWLIN; BARRY L. SHEPHERD; BECKY A. SHEPHERD; CHARLES H.F. WHERRY; DIANE

**S. WHERRY; DOUGLAS O. WILLIAMS; HELEN A. WILLIAMS; RODNEY M. WOLF; NANCY L. WOLF; WILLIAM R. CORDILL; DEBORAH L. CORDILL; EDMOND I. HEWITT, JR.; MARY SUE HEWITT; CORY M. CURTIS; ANGELA H. CURTIS; DENA MOON; JACK H. MORRISON; AND GAYLE ELAINE MORRISON, Appellees**

---

**On Appeal from the County Civil Court at Law No. 1
Harris County, Texas
Trial Court Case No. 1123430**

---

## MEMORANDUM OPINION

The appellees, mostly homeowners of properties that are generally downstream of Lake Conroe, sued the San Jacinto River Authority after Hurricane Harvey, claiming the River Authority's decision to release water from the lake caused flooding that damaged their properties. The River Authority filed a plea to the jurisdiction based on governmental immunity, which the trial court denied. After considering the parties' jurisdictional evidence, we reverse the trial court's order and render judgment dismissing the homeowners' claims.

## BACKGROUND

Lake Conroe is a water supply reservoir near Conroe, Texas. The lake was formed in 1973 after the River Authority built a dam across the West Fork of the San Jacinto River. The normal pool elevation of the lake is 201 feet above sea level, but the River Authority obtained flowage easements around the lake so the elevation

4

may rise as high as 207 feet. The dam at Lake Conroe includes five tainter gates. When the elevation of the lake rises above a safe level, the River Authority opens the tainter gates to release water from the lake. Water released from the lake flows into the West Fork of the San Jacinto River, where it joins with water from numerous other creeks—including Lake Creek and Spring Creek—and eventually flows into Lake Houston.

In August 2017, Hurricane Harvey hit the Texas coast and dropped about 20 inches of rain in southeast Texas. During the hurricane, at least 16 inches fell directly over Lake Conroe and the lake's elevation began to rise. In accordance with the River Authority's gate operating procedures, the River Authority opened the tainter gates to release water from the lake and prevent water from spilling over the top of the dam.

Most of the homeowners' properties are located about 40 miles downstream from Lake Conroe in Kingwood and Humble. During and after the hurricane, they experienced significant, destructive flooding on their properties. The homeowners sued the River Authority, claiming the River Authority committed an unconstitutional taking of their properties by releasing water during the hurricane and knowingly causing or exacerbating the flooding on their downstream properties.

The River Authority filed a plea to the jurisdiction in the trial court based on governmental immunity. The River Authority argued its immunity was not waived

5

because the homeowners did not allege a viable takings claim. The trial court denied the plea, and the River Authority now appeals.

## DISCUSSION

### *Standard of Review*

The River Authority is a political subdivision of the state and is generally entitled to governmental immunity. *San Jacinto River Auth. v. City of Conroe*, 688 S.W.3d 124, 130 (Tex. 2024); *San Jacinto River Auth. v. Gonzalez*, 657 S.W.3d 713, 718 (Tex. App.—Houston [14th Dist.] 2022, no pet.). Governmental immunity from suit implicates a trial court's subject matter jurisdiction, and a governmental entity may assert its immunity in a plea to the jurisdiction. *City of Conroe*, 688 S.W.3d at 130; *Gonzalez*, 657 S.W.3d at 718. We review a plea to the jurisdiction de novo. *Gonzalez*, 657 S.W.3d at 718. We have appellate jurisdiction over this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing interlocutory appeal from order granting or denying plea to jurisdiction by governmental entity).

In a plea to the jurisdiction, a party may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). Here, the River Authority challenges the existence of jurisdictional facts, so the plea to the jurisdiction standard mirrors that of a traditional summary judgment. *See Miranda*, 133 S.W.3d at 228. After a governmental entity

asserts and supports with evidence that the trial court lacks subject matter jurisdiction, the burden of production shifts to the plaintiff to provide evidence showing there is a disputed material fact issue regarding jurisdiction. *Id.*

In determining whether a material fact issue exists, we take as true all evidence favorable to the plaintiff and indulge every reasonable inference and resolve any doubts in the plaintiff's favor. *Clark*, 544 S.W.3d at 771. But we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id.*

If the evidence raises a material fact issue, a court cannot grant the plea to the jurisdiction. *Miranda*, 133 S.W.3d at 227–28. If the evidence is undisputed or fails to raise a fact issue, the court must rule on the plea to the jurisdiction as a matter of law. *Id.* at 228.

The homeowners argue throughout their brief that the plea to the jurisdiction could not be granted because the River Authority did not produce conclusive evidence. At oral argument, the homeowners argued the burden of production had not shifted to them because the River Authority did not produce conclusive evidence negating their allegations. These claims appear to stem from possible confusion caused by this court's opinion in *City of Lake Jackson v. Adaway*, No. 01-22-00033-CV, 2023 WL 3588383 (Tex. App.—Houston [1st Dist.] May 23, 2023, no pet.) (mem. op.).

7

In that case, a similar flood takings case after Hurricane Harvey, we explained that, like a traditional summary-judgment motion, a movant for a plea to the jurisdiction is entitled to judgment as a matter of law if it conclusively disproves at least one element of the opposing party's cause of action. *Id.* at \*4. We also explained that, when a plea to the jurisdiction challenges jurisdictional facts, we take as true all evidence favorable to the nonmovant "[u]nless a pleaded jurisdictional fact is challenged and conclusively negated." *Id.* (citing *City of Austin v. Leggett*, 257 S.W.3d 456, 462 (Tex. App.—Austin 2008, pet. denied)).

Later in the *Adaway* opinion, in discussing the intent element of the property owners' takings claim, we explained that the property owners sufficiently pleaded intent, but the city's evidence did not address the property owner's allegation of intent. *Id.* at \*6–7. Because the city effectively produced no evidence regarding intent, we explained that the burden did not shift back to the property owners to produce evidence of the city's intent, and we must take the property owners' allegations as true. *See Clark*, 544 S.W.3d at 771; *Miranda*, 133 S.W.3d at 228. The city also argued, essentially, a no-evidence summary judgment motion: without producing any evidence on the issue, the city claimed its plea to the jurisdiction must be granted because the property owners did not produce any evidence on intent. *Adaway*, 2023 WL 3588383 at \*7. We again noted that because the city did not first produce evidence, the burden had not shifted to the homeowners to produce

8

evidence. *Id.*; *see also Miranda*, 133 S.W.3d at 228 (explaining that after governmental entity challenges jurisdictional fact with evidence, burden shifts to plaintiff to produce evidence raising fact issue).

*Adaway* does not, as the homeowners suggested at oral argument, state that a governmental entity must produce evidence conclusively disproving the plaintiff's allegations before the burden shifts to the plaintiff to produce evidence in a plea to the jurisdiction challenging jurisdictional facts. *Cf. Miranda*, 133 S.W.3d at 228.

But this possible confusion is ultimately immaterial in this case because the homeowners, although arguing the burden did not shift to them to produce evidence, produced evidence on the two challenged elements of their claims nonetheless.

### *Applicable Law*

The Texas Constitution provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation." TEX. CONST. art. I, § 17(a). This section creates three distinct claims—claims for taking, damaging, and destroying property—but they are all commonly referred to as a "taking." *City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004). Inverse condemnation occurs when a governmental entity intentionally takes, damages, or destroys property for public use without first formally condemning the property as it would in an eminent domain proceeding. *See San Jacinto River Auth.*

9

*v. Burney*, 570 S.W.3d 820, 826 (Tex. App.—Houston [1st Dist.] 2018), *aff'd sub nom. San Jacinto River Auth. v. Medina*, 627 S.W.3d 618 (Tex. 2021).

Article I, Section 17 of the Texas Constitution waives governmental immunity for a takings claim like inverse condemnation. *See Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 390 (Tex. 2011); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980); *Gonzalez*, 657 S.W.3d at 719. But a plaintiff must establish a *viable* takings claim to waive governmental immunity and thus establish the trial court's jurisdiction. *Gonzalez*, 657 S.W.3d at 719. A trial court should, therefore, grant a plea to the jurisdiction if the governmental entity shows, as a matter of law, the plaintiff cannot establish a viable takings claim. *City of Webster v. Hunnicutt*, 650 S.W.3d 792, 798 (Tex. App.—Houston [14th Dist.] 2022, pet. denied).

To establish an inverse condemnation takings claim, a plaintiff must show: (1) a governmental entity performed an intentional act under its lawful authority; (2) that resulted in a taking or damaging of property; (3) for public use. *Id.*

For the second element, a taking or damaging of property, a plaintiff must show the governmental entity's intentional act proximately caused the damage. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 483–84 (Tex. 2012). "Proximate cause is an essential element of a takings case." *Id.* at 483. Proximate cause has two components: cause-in-fact, also known as but-for cause, and foreseeability. *Windrum v. Kareh*, 581 S.W.3d 761, 777 (Tex. 2019); *Rogers v.*

10

*Zanetti*, 518 S.W.3d 394, 403 (Tex. 2017) (explaining that cause-in-fact is "essentially but-for causation"). Cause-in-fact generally requires "proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission ('but for' the act or omission), the harm would not have occurred." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 122 (Tex. 2009)). To make this causal assessment, a court must look to the pleadings and record "to determine if the alleged cause is too geographically or temporally attenuated from the alleged effect." *Rattray v. City of Brownsville*, 662 S.W.3d 860, 874 (Tex. 2023).

The parties disagree about the correct standard for establishing causation in a flood takings case such as this.

### a. Natural Conditions

The Texas Supreme Court discussed causation at length in *Tarrant Regional Water District v. Gragg*, a case with similar facts to the present case in which a landowner asserted an inverse condemnation claim against a water district that built a reservoir and flooded the landowner's property with releases of water from the reservoir. 151 S.W.3d 546, 549–50 (Tex. 2004). The landowner alleged that the water district's releases during heavy rainfall caused significant, damaging flooding on his property. *Id.* at 550. In affirming the jury's verdict in favor of the landowner,

11

the Court noted that the landowner produced evidence that the water district released water "in excess of natural conditions," and the Court held the landowner sufficiently proved the water district caused the significant, damaging flooding. *Id.* at 552, 554. In the present case, the parties disagree about what the relevant natural conditions are, and thus they disagree about the application of the but-for test.

The River Authority asserts that a landowner has the right to pass through the natural flow of surface water to his neighbor's land without incurring liability, citing *Kraft v. Langford*, 565 S.W.2d 223, 228 (Tex. 1978), *disapproved of on other grounds*, *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 281 & n.78 (Tex. 2004). Therefore, a governmental entity is only liable for a takings claim when it passes more than the natural flow of water onto a plaintiff's property, and a plaintiff must compare the flow of water on his land because of the governmental entity's action to the natural flow of water on his land to establish but-for causation. In *Kraft*, the Texas Supreme Court explained the Texas Water Code adopted the Spanish civil law standard under which "a landowner could not burden adjacent lands with surface water he accumulated or discharged except in the same manner in which it would naturally flow." *Id.* at 228–29; *see also* TEX. WATER CODE § 11.086(a) (stating no person may divert "the natural flow of surface waters" in manner that damages property of another). The River Authority argues the Supreme Court applied this standard in *Gragg*. For instance, the Court noted that the landowner produced

12

evidence that the water district released "volumes of water through its flood gates that greatly exceeded what natural flows would have been." *Gragg*, 151 S.W.3d at 552.

However, the rule stated in *Kraft* and in the Water Code only applies to surface water, not flood water. The Water Code does not define the term "surface water," but courts of this state have interpreted the term to mean water diffused over the ground from falling rain or melting snow that is not part of a natural watercourse. *Tex. Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 277–78 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Flood water, by contrast, is water that has overflowed a river, stream, or other natural watercourse. *Id.* at 278. "Waters entering or following a defined course or channel are not considered diffuse surface water." *Michaelski v. Wright*, 444 S.W.3d 83, 93 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "Thus, a landowner might divert the entire Brazos River across his neighbor's property without subjecting himself to liability under Section 11.086 of the Water Code." *Id.* (quoting *Dietrich v. Goodman*, 123 S.W.3d 413, 419 (Tex. App.—Houston [14th Dist.] 2003, no pet.)). That section of the Water Code, and the rule announced in *Kraft*, therefore, do not apply in this case because this case deals only with flood water.

The homeowners argue that "natural conditions" in a flood takings case necessarily means the conditions that would have existed if the dam or reservoir had

never been built. This requires a plaintiff to always compare the flooding he experienced to the flooding that would have occurred if the dam had never been built in order to establish but-for causation. *See Gragg*, 151 S.W.3d at 554. That is the type of evidence the landowner provided in *Gragg. See id.* But in *Gragg*, the water district built the dam in 1987, the water district released water from the dam for the first time in 1990, and the landowner's undeveloped ranch property experienced significant, damaging flooding for the first time when the water district released water for the first time. *Id.* at 550. The landowner easily compared evidence from before the dam was built and after the dam was built. The but-for causes he alleged—the water district's construction and operation of the dam—were not too "temporally attenuated" from the effect on his property. *See Rattray*, 662 S.W.3d at 874.

We disagree that to establish causation in a flood takings case such as this the plaintiff must always compare the flooding to the "natural conditions" that would have existed if the dam had never been built. Such a comparison is too temporally attenuated and too speculative to be probative in a case like this when the dam was built more than 50 years ago, and the area has undergone significant urban development. *See id.*

Although the landowner in *Gragg* compared the flooding that occurred on his land to flooding that occurred before the reservoir was built, not every successful plaintiff in a flood takings case is required to do so. In *City of El Paso v. Ramirez*,

14

for example, the plaintiffs alleged a government action that caused flooding, but the flooding did not result from the construction or use of a reservoir or dam. 633 S.W.3d 246, 250–51 (Tex. App.—El Paso 2021, pet. denied). The plaintiffs alleged their flooding resulted from the city's overfilling of a nearby landfill. *Id.* at 251. Thus, they were required to show that the same damaging floods would not have occurred under the same heavy rainfall conditions without the city's overfilling the landfill, which they did. *Id.* at 254–59. They were not required to prove the flooding would have occurred if the city had never constructed the landfill, which the city had owned and operated for about 20 years. *See id.* at 250.

The plaintiffs in *Ramirez* successfully proved causation because they provided evidence that no "waste infused floods" reached their properties for 20 years before the city overfilled a nearby landfill, but, after the landfill reached capacity and the city continued contributing to it, then their properties flooded three times with water, silt, trash, and toxic waste. *Id.* at 258. This simple but-for comparison suggested the city's overfilling the landfill caused the plaintiffs' properties to flood with water and waste.

The "true test" in a takings case is whether the governmental entity's "intentional acts" proximately caused the plaintiff's damages. *Hearts Bluff Game Ranch*, 381 S.W.3d at 483. We interpret this to mean the starting point of comparison in the but-for test is simply the plaintiff's property as it existed before the

15

governmental entity's intentional acts that are the subject of the takings claim, rather than the natural flow of surface water or the natural conditions that existed before a dam was built—even if that was 50 years ago—as the parties argue.

**b. Substantial Factor**

The River Authority also argues that but-for cause includes a substantial factor test. The Texas Supreme Court has explained that cause-in-fact "is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Windrum*, 581 S.W.3d at 777 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)); *Brandywood Hous., Ltd. v. Tex. Dep't of Transp.*, 74 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). According to the River Authority, a plaintiff must establish the government action was a substantial factor in bringing about the plaintiff's damages, whether the plaintiff alleges the government action caused or exacerbated the damages. When a plaintiff alleges a government action exacerbated flooding effects, the plaintiff's claim is only viable if it rises to the level of a substantial factor. "The source of an additional half-inch [of water] could 'exacerbate' flooding," the River Authority argues in its brief, "but that is no evidence it was a substantial factor in damages if a home was already several feet underwater." Thus, according to the River Authority, it is not enough for the plaintiff to show that some water from a government dam or reservoir reached the plaintiff's property; the plaintiff must show

16

that water was a substantial factor in bringing about the plaintiff's damages. One way to show this is to show how the government action, as opposed to any other contributing cause, actually made the plaintiff's damages worse. *See Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 80 (Tex. 2023) (explaining that, to prove causation in toxic chemical case, plaintiff needed to show *how much* of toxic chemical was required to produce the complained-of injury to crops so jury could exclude other contributing causes and find toxic chemical was substantial factor).

The homeowners argue that under the *Gragg* causation standard, causation is established and a taking occurs "when the first molecule of released water invades the private property or when the first molecule of water from another source is pushed onto the private property by the released water," as stated in the homeowners' appellate brief. The homeowners argue this one-molecule theory finds support in *Gragg*, as well as the Texas Supreme Court's opinion in *Medina* and this court's opinion in *Burney*, although none of the cited cases phrase the causation standard in that way. *See Medina*, 627 S.W.3d at 624 (explaining that a governmental entity's decision to flood downstream properties for public purpose can support takings claim under state constitution); *Gragg*, 151 S.W.3d at 554, 559 (holding landowner proved causation by showing dam construction or operation caused or exacerbated flooding that would not have occurred under same condition if dam had not been constructed); *Burney*, 570 S.W.3d at 835 (explaining plaintiffs'

"straightforward" theory of causation that River Authority released water from Lake Conroe and caused flooding).

By arguing the one-molecule theory, the homeowners reject the River Authority's substantial-factor argument. The homeowners assert that neither *Gragg* nor *Burney* require flooding or flooding effects to be substantial to establish a taking, nor do these cases suggest that a governmental entity is immune from takings liability so long as the flooding effects are not substantial. The homeowners thus assert they need only prove that water from a government dam or reservoir reached their property to establish causation, not that the water was a substantial factor in causing or exacerbating their damages.

The Texas Supreme Court in *Gragg* did not apply a one-molecule theory of causation as the homeowners argue. The Court in effect rejected that theory when it wrote, "[D]amage to the [property] caused by extremely heavy rain, *even if reservoir releases contributed to the volume*, could not in itself support a taking." *Gragg*, 151 S.W.3d at 553 (emphasis added). Thus, the fact that some water released from the reservoir—more than a molecule—made its way onto the property and exacerbated the flooding was not sufficient to establish causation. Further, the Court explained that "[i]t was not enough, of course, for [the landowner] to trace the damaging floods back to releases from the dam." *Id.* at 554. Stated another way, it was not sufficient for him to show that one molecule of water from the reservoir entered his property.

18

"Rather," the Court wrote, "the issue is *significantly changed flooding characteristics* that occurred despite similar circumstances so that it can be inferred that the reservoir was to blame." *Id.* at 553 (emphasis added). The Court emphasized, repeatedly, that the landowner was required to show more than the simple fact that water from the reservoir ended up on his property; he sufficiently proved causation by providing extensive evidence of the "significant, damaging changes in flooding characteristics," *id.* at 558, a phrase (and variations thereof) the Court uses five times in the opinion. *Id.* at 549, 551, 553, 555, 558. *Gragg* implicitly affirms the River Authority's argument that exacerbated flooding effects are part of a viable takings claim only when they rise to the level of a substantial factor in causing the plaintiff's damages. The landowner in *Gragg* provided evidence showing how the water releases from the reservoir—as opposed to heavy rains themselves—made his damages worse, establishing that the water releases from the reservoir were a substantial factor in causing his damages.

In sum, to establish but-for causation, we compare the plaintiff's property as it existed before the governmental entity's intentional acts that are the subject of the takings claim and afterwards. A plaintiff in a flood takings case must establish the governmental entity's intentional acts were a substantial factor in bringing about his damages, whether those damages are flooding or exacerbated flooding effects.

19

Having clarified the causation standard, we now proceed to analyze the River Authority's plea to the jurisdiction.

## *Analysis*

### a. Homeowners' Pleadings

Here, the homeowners allege, generally, that during Hurricane Harvey, the River Authority released water from Lake Conroe to preserve the integrity of the dam, and this caused flooding on their downstream properties, which the River Authority knew was certain to occur because its previous water releases had also caused flooding on the homeowners' properties. Specifically, in their original petition,[1] the homeowners alleged:

- "Plaintiffs' Property would not have flooded absent those releases. Such flooding caused extensive damage to those homes and to the personal property that was inside of them."

- "Plaintiffs' Property would not have flooded under natural conditions (the absence of the lake and the SJRA's obligation to operate and manage the lake, including its real or perceived obligation to release Harvey floodwaters as it did between late August 2017 and early September 2017)[.]"

- "The flooding on Plaintiffs' Property was far worse than would have occurred under natural conditions (the absence of the lake and the SJRA's obligation to operate and manage the lake, including its real or perceived obligation to release Harvey floodwaters as it did between late August 2017 and early September 2017)[.]"

- "None of Plaintiffs' Property would have flooded but for the SJRA's intentional, knowing, affirmative and conscious decision to release

---

[1]    The homeowners filed various petitions that have been consolidated into the present case. The allegations and claims in each petition are identical.

20

water from the lake between late August 2017 and early September 2017 . . . ."

Thus, the homeowners alleged that but for the presence of the lake or SJRA's release of water, their properties would not have flooded or would have flooded far less. This court has concluded, and the Texas Supreme Court has affirmed, that pleadings virtually identical to this allege a viable takings claim. *See Medina*, 627 S.W.3d at 620–21; *Burney*, 570 S.W.3d at 838; *see also San Jacinto River Auth. v. Brocker*, No. 14-18-00517-CV, 2021 WL 5117889, at *8 (Tex. App.—Houston [14th Dist.] Nov. 4, 2021, no pet.) (mem. op.); *San Jacinto River Auth. v. Bolt*, No. 01-18-00823-CV, 2019 WL 2458987, at *2 (Tex. App.—Houston [1st Dist.] June 13, 2019, pet. denied) (mem. op.).

The homeowners have alleged two types of inverse condemnation claims against the River Authority: inverse condemnation of their real and personal property and inverse condemnation by an "inundation, flood, flowage or drainage easement" over their property. As the elements required to establish both claims are the same, we consider these claims together. *See Burney*, 570 S.W.3d at 838 (concluding that because homeowners sufficiently pleaded constitutional takings claims, same allegations also sufficiently supported takings claim for "inundation, flood, flowage or drainage easement").

## b. River Authority's Plea to the Jurisdiction

In its plea to the jurisdiction, the River Authority asserts the homeowners did not and could not establish a viable takings claim because the River Authority did not perform any action that was substantially certain to flood the homeowners' properties and because the River Authority's actions did not cause downstream flooding.[2] We consider only the River Authority's causation argument because it is determinative.

The River Authority asserted that even if the River Authority had not released any water from the dam—an impossible scenario—most of the homeowners' properties would have flooded anyway, and the rest of the homeowners' properties were located outside the influence of the West Fork of the San Jacinto River.

In support, the River Authority produced an expert report by Mark E. Forest. Forest explained that he created a hydrological model of the flood as it would have occurred in the hypothetical scenario in which the River Authority did not release any floodwater from Lake Conroe.

He explained the model was not realistic because it relied on an "infinitely high Lake Conroe Dam," which was impossible because the surface level of the lake would have reached 213.6 feet above sea level, and this would have "compromised

---

[2] The River Authority did not challenge the public-use element of the homeowners' takings claim.

22

the integrity of the dam embankment and created the potential risk of dam failure due to overtopping." A dam failure, Forest explained, "would have resulted in even more catastrophic flooding outcomes downstream than what occurred under existing conditions." The River Authority also produced evidence that, if it had not released any water, then eventually the water would have breached the dam and spilled over the tainter gates in "an uncontrolled manner and at an uncontrolled rate." Hector Olmos, an engineer for the firm that advises the River Authority, stated in an affidavit that if the dam were breached, "every drop of water entering Lake Conroe upstream would eventually reach the dam and then would go over the top of the gates uncontrolled." He explained, "This failure could likely result in an uncontrolled and potentially catastrophic release of all water in Lake Conroe."

Forest concluded based on his modeling that, in the hypothetical scenario in which the River Authority released no water from Lake Conroe, 186 of the 211 homeowners' properties would still have flooded. The remaining homeowners' properties were located outside the area of influence of the West Fork of the San Jacinto River, and, if they experienced flooding, that flooding was due to other sources.

This hypothetical scenario provides a useful comparison because all other factors remain the same except for the River Authority's action that allegedly caused

or exacerbated the homeowners' flooding. This evidence shows the River Authority's action was not the but-for cause of the homeowners' flooding.

Moreover, the timing of the water releases and flooding supported the conclusion that the River Authority's water releases did not cause the homeowners' flooding. Forest explained that water from Lake Conroe would take about 30 hours to travel the 38 miles downstream to reach the Humble and Kingwood areas, where most of the homeowners' properties were located. About 30 hours after the River Authority first released water from Lake Conroe, the Humble and Kingwood areas had already experienced "major flooding," as the river levels had already risen from 41 feet above sea level to 62 feet. This major flooding occurred "without any contribution from Lake Conroe since those contributions had not yet arrived," Forest explained.

Finally, taking into consideration the actual contributions from the River Authority's water releases, only 12% of the water flowing into Lake Houston near Kingwood and Humble originated from Lake Conroe. If water from Lake Conroe contributed to flooding in that area, it did not contribute a significant amount. The River Authority described this as an "inconsequential effect" on the scope of overall flooding.

Therefore, the River Authority produced evidence that its water releases from Lake Conroe did not cause or exacerbate the flooding of the homeowners'

properties. The River Authority's evidence shows that, but for its water releases, the homeowners' properties would have experienced flooding anyway, and even when taking into account the water releases, the water releases did not significantly exacerbate the flooding. The River Authority has presented at least some evidence demonstrating the homeowners cannot assert a viable takings claim and thus cannot show a waiver of the River Authority's governmental immunity.[3] *See Miranda*, 133 S.W.3d at 228; *Gonzalez*, 657 S.W.3d at 719. The burden now shifts to the homeowners to provide evidence showing there is a disputed material fact issue regarding causation to establish jurisdiction. *See Miranda*, 133 S.W.3d at 228.

### c. Homeowners' Response

The homeowners assert they have provided sufficient evidence to at least raise a fact issue as to causation. They primarily rely on the declaration of their hydrology expert, Dr. Philip Bedient, and his analysis of hydrological modeling that shows the River Authority could have made different decisions that would have resulted in less flooding on the homeowners' properties.

---

[3]  The Fourteenth Court of Appeals concluded that substantially similar evidence, including a declaration by Mark Forest that the majority of the plaintiffs' homes would have flooded during Hurricane Harvey anyway and the same peak inflow/peak outflow evidence, "proves as a matter of law that each of the [plaintiffs'] homes would have flooded during Harvey even if the Authority had released no water at all from Lake Conroe and that the [plaintiffs] cannot prove causation on their takings claims." *Gonzalez*, 657 S.W.3d at 725.

Based on Bedient's report, the homeowners asserted three of his findings showed the River Authority caused or exacerbated the flooding of their properties. However, the homeowners rely on their arguments, discussed above, that they must prove causation by comparing the flooding they experienced to the flooding that would have occurred under natural conditions if the dam had never been built, and that they do not need to prove the River Authority's acts were a substantial factor in causing their flooding or exacerbated flooding effects. When considered under the correct but-for causation standard, the homeowners' evidence fails to raise a fact issue as to causation for the reasons we explain below.

*i. Construction of the Dam and Formation of the Lake*

The homeowners pleaded that construction of the dam and formation of Lake Conroe caused or exacerbated flooding on their properties because the same damage to their property would not have occurred under the same rainfall conditions if the dam had never been built and thus Lake Conroe never formed.

Bedient did not conduct his own hydrological modeling. Instead, he analyzed the data from the model created by the River Authority's expert, Mark Forest. Although Forest denied creating a model in which the dam had never been built, Bedient asserted that he found such a model in Forest's data. Bedient explained that under the no-dam scenario he found in Forest's modeling, he analyzed watershed conditions as if the lake and dam had never been built. According to Bedient's report:

The flooding or exacerbated flooding or flood effects, damage and destruction of each of the Plaintiffs' properties as identified herein would not have occurred under the same rainfall conditions during Harvey had the Lake Conroe Dam not been constructed (i.e. natural conditions), based on the HDR modeling of the No Dam scenario.

He explained that, without the dam, the peak flow down the West Fork of the San Jacinto would have been 10,000 cfs less than what actually flowed downstream during Hurricane Harvey, so peak flows and flood levels downstream would have been less.

However, this evidence is insufficient to raise a fact issue as to whether the River Authority's actions caused or exacerbated the homeowners' flooding. The no-dam scenario compares the actual downstream flow to a hypothetical model of what would have occurred if the dam had not been built more than 50 years ago, and this alleged cause—building the dam in 1973—is simply too temporally attenuated and speculative to raise a fact issue as to but-for causation of the alleged effect—flooding or exacerbated flooding of the homeowners' properties. *See Rattray*, 662 S.W.3d at 874; *cf. Gragg*, 151 S.W.3d at 550 (landowner proved building of dam and reservoir in 1987 caused significant flooding on his property by 1990). The homeowner's evidence does not rule out other potential contributing factors, and it does not show that building the dam was a substantial factor in causing or exacerbating their flooding.

Nor does this evidence show the River Authority's actions caused a significant change in the flooding characteristics the homeowners experienced. Bedient concluded less water would have flowed downstream in this scenario, but he does not explain what difference 10,000 cfs of water flowing downstream during a hurricane would have made to the flooding on the homeowners' properties. In *Gragg*, by contrast, the landowner provided observational evidence that his property suffered "extensive damage that it had never experienced" before the water district released water from the dam, that the water district released water in an amount sufficient to cause flooding on his property even if there were no other water in the river, and that when the floodgates were open, water flooded the property much more quickly than when the floodgates were closed. *Gragg*, 151 S.W.3d at 551–53. The Court explained that it was evidence of these "significantly changed flooding characteristics" that supported his takings claim, not only evidence that water from the reservoir contributed to the flooding on his property. *Id.* at 553.

This evidence does not raise a fact issue as to whether the River Authority's actions caused or exacerbated the homeowners' flooding.

*ii. Change in Lake Design before Construction of the Lake*

The homeowners also assert Lake Conroe was originally designed to be a flood control and water supply reservoir, but before its construction, the River Authority chose to build it as only a water supply reservoir. Lake Conroe, as

28

originally designed, would have been able to contain a maximum water surface of 217 feet above sea level. However, the reservoir was actually constructed to contain a maximum water surface of 205 feet above seal level. Bedient opined that if the reservoir had been constructed as it was originally designed, it would have been able to hold all of the inflows from Hurricane Harvey with no water releases, refuting Forest's argument that a scenario in which Lake Conroe retained all of the water was impossible. He explained that the River Authority's release of 79,000 cfs of water, compared to the hypothetical scenario in which it released no water, resulted in two to four feet of additional flooding along the West Fork River. Thus, the homeowners assert, the River Authority's intentional decision to change Lake Conroe's design sometime before 1973 caused or exacerbated their flooding.

Again, this alleged cause—building the reservoir a particular way in 1973—is simply too temporally attenuated and speculative to raise a fact issue as to but-for causation of the alleged effect—flooding or exacerbated flooding of the homeowners' properties. *See Rattray*, 662 S.W.3d at 874; *cf. Gragg*, 151 S.W.3d at 550 (landowner proved building of dam and reservoir in 1987 caused significant flooding on his property by 1990). The homeowner's evidence does not rule out other potential contributing factors, nor does it show that building the dam was a substantial factor in causing or exacerbating their flooding. *See Cox*, 664 S.W.3d at 80 (explaining that to prove causation, plaintiff needed to provide evidence

29

excluding other contributing causes and showing alleged cause was substantial factor in bringing about damages). Additionally, as with the previous finding, this finding also does not provide any evidence of what difference the additional two to four feet of flooding along the West Fork of the San Jacinto River made in terms of the homeowners' flooding or exacerbated flooding. *Cf. Gragg*, 151 S.W.3d at 551–54 (explaining landowner's evidence of extensive damage from water releases and "significantly changed flooding characteristics" supported his takings claim). This evidence does not raise a fact issue as to whether the River Authority's actions caused or exacerbated the homeowners' flooding.

*iii. Change in Gate Operating Procedure in 2010*

Lastly, the homeowners assert that changes in the River Authority's tainter gate operating procedure caused or exacerbated their flooding. The River Authority's first gate operating procedure in 1973 required the River Authority to maintain a rate of outflow from the lake that would reduce the lake level to normal elevation as soon as possible without creating additional flooding downstream. Over the years, the River Authority changed and adjusted its gate operating procedures.

In 2010, the River Authority adopted a new gate operating procedure, developed by an engineering firm, that ensured the River Authority would not release more water from the lake than was flowing into the lake. The River Authority requested this procedure to avoid liability in accordance with the opinion from the

30

Beaumont Court of Appeals in *Wickham v. San Jacinto River Authority*, in which the court granted summary judgment for the River Authority on a flood takings claim in part because the peak outflow from Lake Conroe never exceeded the peak inflow of water to the lake. 979 S.W.2d 876, 883–84 (Tex. App.—Beaumont 1998, pet. denied). This procedure, developed in accordance with *Wickham* to ensure peak outflow never exceeded peak inflow, was the gate operating procedure in effect during Hurricane Harvey.

Bedient analyzed the difference in releases from the dam under the River Authority's earlier gate operating procedure that was in effect in 1994 and under the 2010 gate operating procedure that was in effect during Hurricane Harvey. Bedient determined that if the River Authority had followed its 1994 gate operating procedure, the River Authority would have capped its water releases at about 60,000 cfs, lower than the actual releases of up to 79,000 cfs during Hurricane Harvey. He opined that if the River Authority had followed its 1994 gate operating procedure during Hurricane Harvey, "there would have been less water being released from the dam and therefore less flooding downstream on [the homeowners'] properties." Therefore, Bedient concluded, the River Authority's "gate operating procedures for Lake Conroe Dam and its water releases during Harvey caused or exacerbated the flooding, flood effects, damage and destruction of each of the [homeowners'] properties."

31

Assuming the 2010 change in gate operating procedures is not too temporally attenuated, we still conclude this evidence fails to raise a fact issue as to but-for causation. Evidence that, acting in accordance with a different procedure, the River Authority would have released less water does not establish that the release of water was a substantial factor in bringing about the homeowners' damages. Nor does this evidence show that the River Authority's decision to change its gate operating procedure caused a significant change in the homeowners' flooding characteristics. Bedient did not explain what difference the approximately 19,000 cfs of water made in terms of the homeowners' flooding or exacerbated flooding. *Cf. Gragg*, 151 S.W.3d at 551–54 (explaining landowner's evidence of extensive damage from water releases and "significantly changed flooding characteristics" supported his takings claim). Bedient also does not explain whether releasing less water was even possible or advisable, given the River Authority's evidence that if it had not released water when it did, the dam would have failed and caused catastrophic flooding downstream. *See Prestonwood Ests. W. Homeowners Ass'n v. City of Arlington*, No. 02-21-00362-CV, 2022 WL 3097374, at *7 (Tex. App.—Fort Worth Aug. 4, 2022, no pet.) (mem. op.) (concluding plaintiffs in flood takings case failed to prove causation because dam was likely to fail anyway if city had taken no action, so plaintiffs could not prove their damages would not have occurred but for city's

action). This evidence does not raise a fact issue as to whether the River Authority's actions caused or exacerbated the homeowners' flooding.

*iv. Other Evidence*

Some of the homeowners' evidence shows that water released from Lake Conroe reached their properties. The River Authority does not dispute that fact. Yet, as discussed above, the homeowners were required to prove more than the fact that the water reached their properties—they needed to show the water released from Lake Conroe was a substantial factor in bringing about or exacerbating their flooding or causing a significant change in flooding characteristics. They failed to provide evidence that does so.

The homeowners produced evidence that the Harris County Flood Control District estimated that 32% of the water flowing through the West Fork of the San Jacinto River during Hurricane Harvey was from Lake Conroe, in contrast to the River Authority's estimate of 12%. Regarding Lake Conroe, the District found:

- A new record pool elevation of 206.20 ft was recorded for Lake Conroe surpassing the previous record pool of 205.60 ft in October 1994.

- A peak release rate of 79,140 cfs was passed through the Lake Conroe flood gates into the West Fork of the San Jacinto River in accordance with emergency procedures for an extreme event to protect the integrity of the dam structure. A peak inflow of 130,000 cfs was recorded into Lake Conroe.

- While Lake Conroe released 79,140 cfs, three other uncontrolled watersheds: Spring Creek, Cypress Creek, and Lake Creek

33

contributed a total of 165,200 cfs into the West Fork of the San Jacinto River. It is estimated that 240,900 cfs flowed through the West Fork of the San Jacinto River at Humble (US 59) of which 32% was water from Lake Conroe.

- Of the total estimated inflow of 491,800 cfs into Lake Houston 16% was from Lake Conroe.

The River Authority estimated 12% of the water flowing into Lake Houston originated from Lake Conroe, and the District's estimate of 16% is similar. And even though the District estimated that 32% of water in the West Fork of the San Jacinto River near Humble was from Lake Conroe, it also found that "three other uncontrolled watersheds" contributed 165,200 cfs of water into the river, whereas Lake Conroe released 79,140 cfs of water. Considered altogether, this evidence does not raise a fact issue as to whether the River Authority's water releases were a substantial factor in causing or exacerbating the homeowners' flooding.

Next, the homeowners, in an attempt to show that more than a molecule of water from Lake Conroe reached their properties, pointed to a table created by the River Authority's expert, Mark Forest. The homeowners argue that the table proves that Forest agreed water released from Lake Conroe reached their properties. He did, and even though this fact is undisputed, it does not alone prove causation. *See Gragg*, 151 S.W.3d at 554 ("It was not enough, of course, for [the landowner] to trace the damaging floods back to releases from the dam."). The table includes columns providing the actual water elevations with modeled water elevations if no water had

34

been released for each homeowner. Using the first homeowner's property listed in the table as an example, the homeowners explain the table shows that the property had an actual water elevation of 71 feet, while the modeled water elevation if no water had been released was 66.4 feet. Therefore, the homeowners argue, the table shows that 4.6 feet of water on that property was either from Lake Conroe or pushed there by water released from the lake. But, considering that the actual water surface elevation was 71 feet, the evidence standing alone does not show that 4.6 feet of water was significant or substantial in either causing flooding or exacerbating flooding effects. *Cf. id.* at 551–54 (landowner proved water district caused significant, damaging changes in flooding characteristics on his property with evidence that flooding on his property was not significantly destructive before reservoir was built but was "significantly changed" and his property suffered "extensive damage" afterwards). The homeowners maintain they were not required to provide evidence that the River Authority's water releases were a substantial factor in causing or exacerbating their flooding, and they did not do so.

Lastly, the homeowners also argued the River Authority caused their flooding by not pre-releasing water from Lake Conroe before Hurricane Harvey, but this argument likewise fails because it does not allege affirmative conduct by the River Authority. *See Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 800 (Tex.

2016) (stating only affirmative conduct by governmental entity will support takings claim).

* * *

In sum, the homeowners' evidence attempts to show that if the dam had never been built, if the dam had been built differently, or if the dam had been operated differently, their flooding would not have occurred or would have been less. However, they have not produced evidence sufficient to raise a fact issue as to whether the River Authority's water releases during Hurricane Harvey were a substantial factor in bringing about their flooding or exacerbated flooding or caused a significant change in their flooding characteristics during a hurricane that released up to 20 inches of water.

The River Authority produced evidence that, even if the River Authority had released no water, most of the homeowners' properties would have flooded anyway, and to the extent water released from Lake Conroe contributed to the homeowners' flooding, it was not significant or substantial. The homeowners' evidence does not raise a fact issue to refute the River Authority's evidence.

The homeowners have not met their burden to provide evidence showing there is a material fact issue as to the causation element of their inverse condemnation claim. *See Miranda*, 133 S.W.3d at 228. Therefore, they have not established a viable

takings claim, and the trial court erred in denying the River Authority's plea to the jurisdiction. *See Gonzalez*, 657 S.W.3d at 719; *Hunnicutt*, 650 S.W.3d at 798.

## CONCLUSION

We reverse the trial court's order denying the River Authority's plea to the jurisdiction and render judgment dismissing the homeowners' claims.


Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Hightower.